Donald F. NICHOLS, Plaintiff-Appellant,

v.

SPENCER INTERNATIONAL PRESS, INC., and the Crowell-Collier Publishing Company et al., Defendants-Appellees.

Nos. 15523, 15526.

United States Court of Appeals
Seventh Circuit.

Jan. 11, 1967.

Rehearing Denied in No. 15523
Feb. 28, 1967 en Banc.

Modified on Rehearing in No. 15526
March 7, 1967.

Harold W. Jones, Smith & Jones, Robert W. Geddes, James G. Strawbridge, Indianapolis, Ind., for plaintiff-appellant.

Thomas M. Lofton, Karl J. Stipher, Indianapolis, Ind., for Spencer International Press Inc. Baker & Daniels, Indianapolis, of counsel.

Jerry P. Belknap, William P. Wooden, Indianapolis, Ind., for The Crowell-Collier Publishing Co. and P. F. Collier, Inc. Barnes, Hickam, Pantzer & Boyd, Indianapolis, Ind., of counsel.

Before CASTLE, KILEY and FAIRCHILD, Circuit Judges.

FAIRCHILD, Circuit Judge.

Action for treble damages under 15 U.S.C.A. § 15 (§ 4 of the Clayton Act), for alleged violation of 15 U.S.C.A. §§ 1 and 2 (§§ 1 and 2 of the Sherman Act). Plaintiff Donald Nichols claims damages resulting from loss of opportunity for employment.

On motions for summary judgment the district court gave judgment dismissing the complaint against defendant Spencer International Press, Inc. ("Spencer"), and entered an order, with respect to the antitrust issues, in favor of defendants Crowell-Collier Publishing Company ("Crowell-Collier") and P. F. Collier, Inc. No judgment was entered as to the latter two defendants because breach of contract claims remain to be tried, but the district court made an appropriate certificate, and this court gave leave to appeal under 28 U.S.C.A. § 1292(b). Plaintiff appealed from the judgment and the order.

The material facts, appearing in the complaint,[1] are summarized as follows:

Defendants Crowell-Collier and its subsidiary P. F. Collier, Inc., and Grolier, Inc. and its subsidiary, Spencer, are engaged in the sale of encyclopedias and reference books in interstate commerce. P. F. Collier, Inc. employed Nichols as a sales supervisor having charge of particular areas, but summarily discharged him without notice or cause December 10, 1962. Spencer employed him in a similar capacity January 3, 1963, but terminated his employment February 2, 1963, as a result of pressure from P. F. Collier, Inc., and because of a so-called "no-switching" agreement to which these companies are parties. In January, plaintiff had succeeded in persuading a number of sales employees of P. F. Collier, Inc., to resign and apply for employment with Spencer, under plaintiff's supervision.

It is alleged that defendants and others agreed to

"enter into or give force and effect to so-called 'no-switching' agreements, understandings, practices and policies under which each defendant did and does refuse to permit employees or other sales personnel to go to work for competitors, and did and does refuse to hire employees and sales personnel of any other defendant or of any other competitors who leave or have left the employ of such other defendant or competitor."

It is further alleged that the agreement, together with the dominant position of Crowell-Collier and P. F. Collier, Inc.,

"placed the plaintiff within the economic power of Crowell-Collier and P. F. Collier. And they exerted that power against the plaintiff as herein alleged to deprive him of his right to change, seek and take employment of his choice among employers in competition with Crowell-Collier and P. F. Collier."

It appears that under the "no-switching" agreement, a party thereto is not to

---

1. Material before the court, by affidavit, in addition to the complaint, is of little consequence, and the posture of the case was virtually the same as if defendants had moved to dismiss for failure to state a claim.

employ a former employee of another party until six months after the termination of the former employment. Accordingly, Spencer did not again employ plaintiff until August, 1963.

There are also averments that defendants were attempting to monopolize trade and commerce, that they intended that Crowell-Collier should become a "dominant" publisher of encyclopedias and reference books, and that the effect of the "no-switching" agreement has been to impair competition among defendants and others. The breadth of these averments seems to have been restricted on oral colloquy in the district court. Plaintiff's counsel indicated that adherence to the "no-switching" agreement affecting freedom of employment was the violation of the antitrust laws being claimed, and that plaintiff was not prepared to establish, beyond that, any agreement or combination in restraint of trade, affecting the business of supplying encyclopedias and reference books.

15 U.S.C.A. § 15 (§ 4 of the Clayton Act, 38 Stat. 731) permits "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws" to recover three-fold damages.

Defendants' principal contentions are that the facts claimed with respect to the "no-switching" agreement do not amount to a violation of any antitrust law and that plaintiff's inability to obtain employment is not an injury "in his business or property."

■ Addressing the second contention first, we readily conclude that one who has been damaged by loss of employment as a result of a violation of the antitrust laws is "injured in his business or property" and thus entitled to recovery under 15 U.S.C.A. § 15. Work as the employee of another is not, indeed, an independent business enterprise, and an opportunity to perform such work may not be property in the ordinary sense, but the interest invaded by a wrongful act resulting in loss of employment is so closely akin to the interest invaded by impairment of one's business as to be indistinguishable in this context.

In Radovich v. National Football League,[2] plaintiff was a professional football player and coach. The supreme court held that his complaint, alleging that he was blacklisted by possible employers as a result of a conspiracy to monopolize interstate commerce in professional football, stated a claim against the alleged conspirators. The contention here made (that one who is damaged by loss of opportunity for employment is not "injured in his business or property") does not appear to have been raised against Radovich. Radovich's claim did, however, rest upon his loss of opportunity to be employed, and the court and the parties must have assumed that such loss falls within the type of injury for which damages may be recovered under 15 U.S. C.A. § 15. Mr. Justice Clark, writing for the court, did say:

"Petitioner's claim need only be 'tested under the Sherman Act's general prohibition on unreasonable restraints of trade,' Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 614, [73 S.Ct. 872, 97 L.Ed. 1277] [1953], and meet the requirement that petitioner has thereby suffered injury. Congress has, by legislative fiat, determined that such prohibited activities are injurious to the public and has provided sanctions allowing private enforcement of the antitrust laws by an aggrieved party. These laws protect the victims of the forbidden practices as well as the public."[3]

This court, in 1942, dealt with the claim of a plaintiff who was apparently an independent contractor, rather than an employee, serving as a sales representative.[4] Defendants were manufacturers of fire prevention equipment and fire extinguishers, who combined to suppress competition. Apparently because of unlawful allocations, Roseland was deprived of the opportunity of making sales in particular territories.

2. (1957), 352 U.S. 445, 77 S.Ct. 390, 1 L. Ed.2d 456.

3. Id. 352 U.S. at 453-454, 77 S.Ct. at 395.

4. Roseland v. Phister Mfg. Co. (7th Cir. 1942), 125 F.2d 417, 139 A.L.R. 1013.

This court held that a plaintiff need not, in order to recover under § 15, carry on a business in competition with violators of the antitrust laws, and suffer injury in such business as a result. "Business" it was said, "denotes 'the employment or occupation in which a person is engaged to procure a living.' "[5] In the light of the remedial purpose of the section, the court concluded that Roseland should not be barred "by what seems to us a strained and unjustified limitation" on the meaning of "business."

In Vines v. General Outdoor Advertising Co.,[6] the second circuit concluded that a plaintiff, employed by defendant to solicit orders for advertising might have a valid claim under § 15 if he could show that defendant deprived him of an opportunity to earn by shifting a potential customer to another firm, pursuant to an agreement which violated the antitrust laws.

The question whether the complaint here shows a substantive violation of the antitrust laws is more difficult. In *Radovich, Roseland,* and *Vines,* there were, or were assumed to be, a monopoly of or an agreement in restraint of trade in the service or commodity supplied by the particular enterprises. Thus violations of the antitrust laws were present, and loss of employment opportunity caused by such violations provided the basis for recovery.

Defendants here point out that the only allegedly unlawful agreement among defendants is the so-called "no-switching" agreement, requiring them to refuse for a period to employ former employees of competitors.[7] Defendants rely primarily upon two provisions of the Clayton Act to demonstrate, as a matter of law, that such agreements cannot amount to a violation of the "antitrust laws" (defined in the Clayton Act to include the Sherman Act, the Clayton Act, and certain others).

The first provision relied on is § 6.[8] The readily apparent purpose of this section is to permit the existence of labor and certain other mutual help organizations without being deemed combinations or conspiracies in restraint of trade. Except that the first sentence indicates that an agreement restraining freedom with respect to employment of labor is not, *as such,* a violation of the antitrust laws, § 6 has no application to the situation before us.

The other provision relied on is § 20.[9] This section protects the freedom of parties to labor disputes to employ the tactics described, in resolving such disputes, and to prohibit or minimize judicial interference with such activities. It is inapposite in the instant case.

Granting that the antitrust laws were not enacted for the purpose of preserving freedom in the labor market,

---

**5.** Id. 125 F.2d at 419.

**6.** (2d Cir. 1948), 171 F.2d 487, 491.

**7.** Monopoly or attempt to monopolize is charged only in general terms.

**8.** Now 15 U.S.C.A. § 17, providing as follows: "The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purposes of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws."

**9.** Now 29 U.S.C.A. § 52. In its first paragraph, this section provides that "No restraining order or injunction shall be granted" in any case, between parties to an employment relationship, "involving, or growing out of, a dispute concerning terms or conditions of employment," except under certain conditions. The second paragraph provides, in part, that "no such restraining order or injunction shall prohibit any person or persons * * * from ceasing * * * to employ any party to such dispute, or from recommending, advising, or persuading others by peaceful and lawful means * * *." Reliance is principally placed on the last clause of this paragraph "nor shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States."

nor of regulating employment practices as such, nevertheless it seems clear that agreements among supposed competitors not to employ each other's employees not only restrict freedom to enter into employment relationships, but may also, depending upon the circumstances, impair full and free competition in the supply of a service or commodity to the public.

For example, the service supplied to the public by a professional football club is highly dependent upon the ability of the players employed by the club, and a black-listing agreement, such as involved in *Radovich*, is, from the point of view of the public, an impairment of competition as to the quality of the service supplied, even though, as between player and club it is only a restriction on freedom to employ.[10]

The second circuit discerned a similar restraint upon competition in a "no-switching" agreement between employees who sold magazines, door to door. In Union Circulation Co. v. F. T. C.,[11] petitioners were charged with engaging in unfair methods of competition and unfair or deceptive acts or practices in violation of 15 U.S.C.A. § 45(a) (§ 5 of the Federal Trade Commission Act). Petitioners were agencies engaged in the business of selling subscriptions for magazines and periodicals by door-to-door solicitation who entered into "no-switching" agreements "solely in order to prevent the fraudulent practices of certain crew members". Apparently the magazine-selling industry had been "undermined by the deceptive selling practices and other fraudulent conduct of many of the solicitors in the field" and the companies contended that these agreements helped them maintain agency discipline and standards by reducing employee mobility between agencies. Presumably a solicitor was more amenable to discipline if he knew he couldn't switch jobs easily. Each signatory agreed not to hire each other's ex-

employees until one year after the employee's termination.

An examiner held that the "no-switching" agreements were a reasonable attempt at self regulation. The commission reversed. The court of appeals affirmed, holding the "agreements, in the context of the industry affected, to be harmful to competition, and therefore an unreasonable restraint of trade within the meaning of the Sherman Act. * * *"

" * * * Here it appears that the reasonably foreseeable effect of the 'no-switching' agreements will be to impair or diminish competition between existing subscription agencies, and to prevent would-be competitors from engaging in similar activity. One probable result of the agreements, because entered into by organizations that represent a very substantial segment of the industry, will be to 'freeze' the labor supply, which is the indispensable element of the door-to-door magazine-selling trade. Although only the signatory agencies are bound by the agreements, a crew member working for one of them will hesitate to leave his employer in order to join a newly formed competitor, or an expanding established one, if he knows that he may be out of work for a year in the event that the latter agency does not prove to be successful. The tendency of the 'no-switching' agreements is to discourage labor mobility, and thereby the magazine-selling industry may well become static in its composition to the obvious advantage of the large, well-established signatory agencies and to the disadvantage of infant organizations." [12]

The United States Supreme Court has seldom considered, in light of the antitrust laws, the validity of employer agreements directed solely at industry employment practices. In Anderson v. Ship-

---

**10.** Since *Radovich*, Congress has exempted from the antitrust laws two types of joint agreements among persons engaged in organized professional team sports. One type of exempted agreement concerns sponsored telecasting of games (75 Stat. 732, 15 U.S.C.A. § 1291 (1961)). The other concerns the combination of two or

more professional football leagues in an expanded single league, if such agreement increases the number of clubs (P.L. 89-800, 1966, 80 Stat. 1508, 15 U.S.C.A. § 1291).

**11.** (2d Cir. 1957), 241 F.2d 652.

**12.** Id. 241 F.2d at 658.

owners' Ass'n of the Pacific Coast,[13] the defendant associations, alleged to be dominant, required every prospective seaman to register with them. A registration certificate was issued to each seaman reciting in part that no person would be employed unless registered, that the certificate must be delivered to the master of the vessel, and that the certificate was the personal record of the seaman and the basis of his future employment. All association members were bound to hire in accordance with the terms of the certificate. The question reached the Supreme Court after the district court granted a motion to dismiss. The court reversed, stating:

> " * * * each shipowner and operator in this widespread combination has surrendered his freedom of action in the matter of employing seamen and agreed to abide by the will of the associations. * * * These shipowners and operators having thus put themselves into a situation of restraint upon their freedom to carry on interstate and foreign commerce according to their own choice and discretion, it follows, as the case now stands, that the combination is in violation of the Anti-Trust Act." [14]

■ We cannot say, as a matter of law, that the effect of the "no-switching" agreement, challenged in this case, upon the business of supplying encyclopedias and reference books is so negligible that the agreement is not a restraint of trade in such products. We deem it error to have granted summary judgment upon the antitrust issues without further inquiry into the facts. As noted above, the posture of this case is such that granting summary judgment is tantamount to holding that the complaint failed to state a claim.

■ If, from the facts developed upon further proceedings, it does appear that the "no-switching" agreement impairs competition in the supply of encyclopedias and reference books, a question of degree may well arise, or of whether reasonable latitude may be afforded to protect some legitimate interest of the employers.

13. (1926), 272 U.S. 359, 47 S.Ct. 125, 71 L.Ed. 298.

14. Id. 272 U.S. at 364–365, 47 S.Ct. at 127.

Reasonableness was explored in Union Circulation Co. v. F. T. C.[15] and in a British decision.[16] Agreements not to compete are tested by a standard of reasonableness. We do not attempt to deal with questions of this type at this stage of the proceeding.

The judgment and order appealed from are reversed and the cause remanded for further proceedings.

On Petition for Rehearing
In No. 15526.

PER CURIAM (in No. 15526).

■ In a petition for rehearing, counsel for Crowell-Collier and P. F. Collier, Inc. point out that in entering the order appealed from the court determined that plaintiff could not assert as a claim under the antitrust laws his claim for unpaid compensation alleged to be due under the contract for services rendered during periods of actual employment. We agree with that determination. Our mandate, accordingly, will affirm the order insofar as it so determines, reversing it in all other respects.

15. (2d Cir. 1957), 241 F.2d 652, 656–657.

16. Kores Manufacturing Co., Ltd. v. Kolok, [1959] Ch. 108 (C.A.).