James R. PROVINCE, et al., Plaintiffs,

v.

CLEVELAND PRESS PUBLISHING COMPANY, et al., Defendants.

Civ. A. No. C 83-847.

United States District Court, N.D. Ohio, E.D.

Sept. 1, 1983.

Robert M. Phillips, Cleveland, Ohio, for plaintiffs.

Robert A. Goodman, Craig M. Brown, James P. Garner, Cleveland, Ohio, William E. Willis, Sullivan & Cromwell, Tobias J. Bermant, Sabin, Bermant & Blau, New York City, for defendants.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

Plaintiffs seek the enforcement of various collective bargaining agreements, and damages for the violation of various antitrust laws. Four of the five defendants move to dismiss counts of the complaint pursuant to Fed.R.Civ.P. 12(b)(6). Three of the four move in the alternative for summary judgment on various counts pursuant to Fed.R.Civ.P. 56. For the reasons set forth below, each motion is denied.

This Court's jurisdiction rests on 28 U.S.C. §§ 1331 and 1337, 29 U.S.C. § 185, and 15 U.S.C. § 15.

Plaintiffs ("the employees") are 89 former employees of the now defunct Cleveland Press ("the Press"), a daily newspaper which ceased publication on June 18, 1982. The terms and conditions of their employment with the Press were governed by collective bargaining agreements negotiated with the newspaper by their union, Cleveland Typographical Union No. 53 ("the Union").

Defendant H.W. Scripps & Co. ("Scripps") owned and operated the Press until October of 1980, when it sold the paper to Cleveland Press Publishing Co., Inc. ("Press Publishing"). Defendant Joseph Cole is the principal owner and president of Press Publishing and a general partner and majority owner of defendant Lakeside Associates, a limited partnership. Defendant Plain Dealer Publishing Company ("The Plain Dealer"), formerly Forest City Publishing Company, publishes The Plain Dealer, now the sole daily and Sunday newspaper in the Greater Cleveland area.

Prior to 1972, Scripps and The Plain Dealer were separate parties, on a multi-employer basis, to a collective bargaining agreement with the Union. On January 17, 1972, Scripps and The Plain Dealer entered into a supplemental job security agreement with the Union, under which each publisher guaranteed its eligible workers lifetime employment. The agreement was to terminate if a publisher went out of business, but would continue in the event of a merger.[1] Its language was incorporated by reference into subsequent multi-employer collective bargaining agreements. The last such agreement became effective on January 1, 1978, and was to expire on December 31, 1983.

On October 15, 1980, prior to the sale of the Press, Press Publishing and a Union official executed a letter agreement under which Press Publishing assumed, on a single employer basis, the contract between the

---

[1] The relevant paragraphs read as follows:

2. Each eligible employe listed on the job Security Roster will be entitled to a regular full-time job in the bargaining unit of employes represented by the Union for the remainder of his working life until such employe dies, retires, or resigns; provided, however, that in the event the Publishers, or either of them, permanently cease publication that such employment guarantee shall thereupon cease, and provided further, that during any period of temporary suspension by the Publishers, or either of them, the job guarantee will be suspended for such period of temporary suspension of publication....

3. In the event that the Publisher merges with any other publisher or consolidates its business in any manner or changes its operation in any manner, such change of circumstance will in no manner abrogate or alter this Agreement and any successor employer, publisher, company, or enterprise will be as fully bound by the terms of this Agreement as if such changed enterprise had been an original party hereto.

Union and the paper[2] and promised to negotiate a full collective bargaining agreement at a later time. Only "proposals" for an agreement appear in the record before us. On October 29, 1980, Press Publishing and the Union official executed another letter agreement providing for a collective bargaining agreement that would become effective on the closing date of the sale of the Press and that would supercede any of Scripps' obligations under the 1978 agreement.[3] Plaintiff employees contend that neither letter agreement was properly ratified by the Union membership, nor by the International President, and are therefore void. The sale of the Press was closed on October 30, 1980.

On June 18, 1982, Press Publishing ceased publication of the Press and fired the paper's employees. The Plain Dealer hired some of these employees, acquired an advertising insert, comics, and editorial columnists, and purchased the Press's subscription lists for $6,000,000. Employees who were not hired demanded that Scripps, The Plain Dealer and Press Publishing provide them with jobs as required by the job security agreement and with other benefits provided for in the collective bargaining agreement. When the defendants refused to do so, the employees filed this lawsuit.

In Count I of the complaint, plaintiff employees allege that defendants Scripps and The Plain Dealer unlawfully breached the job security agreement by refusing to provide jobs and vacation pay to the terminated Press employees.

In Count II, they repeat this allegation and allege that Press Publishing, by acquiring the Press from Scripps, is liable along with Scripps and The Plain Dealer for the breaches alleged in Count I.

Count III alleges that Press Publishing and The Plain Dealer breached the collective bargaining agreement by failing to provide adequate severance pay to the employees.

Counts IV and V allege that prior to the closing of the Press, a conspiracy was entered into between The Plain Dealer, Press Publishing, and Joseph Cole, the President of Press Publishing. Under the alleged conspiracy, Press Publishing and Cole agreed not to sell the Press to any competitor of The Plain Dealer; in return, The Plain Dealer agreed to purchase certain Press assets—such as subscription lists—for amounts far in excess of their actual value. It is further alleged that the dual purposes of this conspiracy were to eliminate all major competition to The Plain Dealer's business and to terminate the job security agreement. Counts IV and V assert that this conduct violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and seek treble damages under Section 4 of the Clayton Act, 15 U.S.C. § 15.

Count VI alleges that Press Publishing fraudulently conveyed real property and other assets to Lakeside Associates for the express purpose of evading Press Publishing's debts and obligations. Lakeside has filed an answer but has not joined in any of the presently pending motions. The

2. The agreement reads in part:
 Therefore, this letter shall constitute a memorandum of agreement between your Union and The Cleveland Press Publishing Company as follows:
 1. The Cleveland Press Publishing Company shall assume (on a single employer basis) the current contract and all written supplements thereto between your Union and The Cleveland Press, and the duration of the new contract between your Union and The Cleveland Press Publishing Company shall be from the date of acquisition through December 31, 1983.

3. The agreement reads in part:

It is understood and agreed by the undersigned that on the Closing Date of the sale of The Cleveland Press to The Cleveland Press Publishing Company (a corporation organized by Joseph Cole), the collective bargaining agreement negotiated by The Cleveland Press Publishing Company and Cleveland Typographical Union No. 53 will become effective, will supersede and supplant the collective bargaining agreement between the E.W. Scripps Company and Cleveland Typographical Union No. 53 and that the E.W. Scripps Company from the Closing Date forward shall not be a party to any collective bargaining agreement with the Union.

charges levelled in this Count need not be addressed at this time.

## I. THE SECTION 301 ALLEGATIONS

### A. *Liability of Scripps and The Plain Dealer Under the Union—Press Publishing Contract.*

■ Section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), grants federal courts jurisdiction to examine alleged violations of collective bargaining agreements:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). A § 301 claim must (1) allege violations of (2) a contract (3) between an employer and a labor organization, *e.g., Carpenters Local Union No. 1846 v. Pratt-Farnsworth,* 690 F.2d 489, 500 (5th Cir.1982), *reh'g denied,* 696 F.2d 996 (1983), *petition for cert. filed,* 51 U.S.L.W. 3974 (U.S. Feb. 22, 1983) (No. 82–1414).

■ Section 301 permits suits both by unions and by individual union members "seeking to vindicate 'uniquely personal' rights of employees such as wages, hours, overtime pay, and wrongful discharge." *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 562, 96 S.Ct. 1048, 1055, 47 L.Ed.2d 231 (1976), quoting *Smith v. Evening News Assn.,* 371 U.S. 195, 198–200, 83 S.Ct. 267, 269–270, 9 L.Ed.2d 246 (1962). Such rights must arise out of the collective bargaining agreement. *Ruzicka .v. General Motors Corporation,* 528 F.2d 912 (6th Cir.1975); *Broniman v. Great Atlantic & Pacific Tea Co.,* 353 F.2d 559, 561 (6th Cir.1965), *cert. denied,* 384 U.S. 907, 86 S.Ct. 1343, 16 L.Ed.2d 360 (1966).

Most courts agree that a § 301 suit may only be brought against a party to the agreement, holding that an action against a non-party is not a "suit for violation of contracts between an employer and a labor organization." *Carpenters Local Union No. 1846 v. Pratt-Farnsworth, supra,* at 500; *Loss v. Blankenship,* 673 F.2d 942, 947–48 (7th Cir.1982); *Aacon Contracting Co. v. Association of Catholic Trade Unionists,* 276 F.2d 958 (2d Cir.1960); *Cate v. Blue Cross & Blue Shield,* 434 F.Supp. 1187, 1189 (E.D. Tenn.1977). However, the Third and Ninth Circuits, acting on the Supreme Court's suggestion that employees with vested retirement rights have a § 301 action for breach of contract if their benefits are unilaterally altered, have permitted suits against non-party trustees of pension funds established by collective bargaining agreements. *Nedd v. United Mine Workers,* 556 F.2d 190 (3d Cir.1977), *cert. denied,* 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 757 (1978); *Rehmar v. Smith,* 555 F.2d 1362 (9th Cir. 1976); *Alvares v. Erickson,* 514 F.2d 156 (9th Cir.), *cert. denied,* 423 U.S. 874, 96 S.Ct. 143, 46 L.Ed.2d 106. *See, Chemical Workers v. Pittsburgh Glass,* 404 U.S. 157, 181 n. 20, 92 S.Ct. 383, 398 n. 20, 30 L.Ed.2d 341 (1971).

Scripps and The Plain Dealer jointly contend that the October 15, 1980 single-employer agreement between the Union and Press Publishing completely superceded the 1978 multi-employer agreement. Scripps cites in addition the October 29, 1980 letter explicitly terminating its liability; The Plain Dealer argues that even if the 1978 agreement did survive the 1980 transactions, publishers of another paper could not be held liable for breaches committed by owners of the Press.

The employees argue that the 1978 agreement was never terminated, and hence is still valid. They claim 1) that in 1980, the Union and Press Publishing never completed a full collective bargaining agreement; 2) that local Union officials never obtained the approval of the membership or of the International President for the October 15, 1980 agreement with Press Publishing; and 3) that the membership never ratified the October 29, 1980 letter releasing Scripps from liability.

Alternatively, the employees argue that the agreements between the Union and Press Publishing, even if properly effectuated, did not revoke the 1978 agreement, but rather constituted a supplement establishing Press Publishing as a guarantor of the still-valid original agreement. Any subsequent withdrawal from the agreement by Scripps and The Plain Dealer is claimed to be both procedurally deficient (since the Union was not given adequate notice), and substantively suspect (since efforts to withdraw from multi-employer agreements should be strictly construed against the employers. *Detroit Newspaper Publishers Assn. v. NLRB,* 372 F.2d 569 (6th Cir.1967)).

 For purposes of a Motion to Dismiss, this Court must accept the material allegations of the complaint as true and consider them in a light most favorable to the plaintiff. A complaint may not be dismissed unless the court is certain that the plaintiff is not entitled to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); 2A Moore, Federal Practice ¶ 12.08, at 2271–74. This Court may grant a motion for summary judgment only if there is no issue of material fact and the moving party is entitled to prevail as a matter of law.

 Here, plaintiff employees have raised substantive factual questions concerning the ratification and validity of the 1980 letter agreements, precluding a finding at this time that Scripps and The Plain Dealer were released from the 1978 agreement.

B. *Liability of Scripps, The Plain Dealer and Press Publishing Under the 1978 Multi-Employer Agreement After The Press Ceased Publication.*

 If the 1978 collective bargaining agreement survived the 1980 letter agreements, the parties next dispute whether it outlasted the Press itself. The publishing companies rely upon its second paragraph, under which all job security rights terminated when publication stopped, while the

employees rely upon the third paragraph, under which lifetime employment rights survive a merger of the publication in question.[4] The employees allege that the incorporation of numerous Press features—the advertising insert, comics, and columnists—into The Plain Dealer constituted a merger.

They further contend that even if no merger occurred, the publishers' obligations under the job security agreement outlived the collective bargaining agreement itself. This argument is based, by analogy, on 1) cases holding that an arbitration clause of a defunct agreement may be invoked to compel arbitration of a dispute that arose under that agreement, *Nolde Brothers, Inc. v. Bakery Workers,* 430 U.S. 243, 97 S.Ct. 1067, 51 L.Ed.2d 300 (1977); *John Wiley & Sons v. Livingston,* 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964); 2) cases holding prior and successor owners of a continuing operation jointly and severally liable for a back pay award to improperly discharged employees, *Golden State Bottling Company v. NLRB,* 414 U.S. 168, 181, 94 S.Ct. 414, 423, 38 L.Ed.2d 388 (1973), *NLRB v. East Side Shopper,* 498 F.2d 1334 (6th Cir.1974); and 3) cases holding that employer obligations to fund severance pay, vacation pay and pensions survive completion of a collective bargaining agreement, *International Union, United Automobile, Aerospace and Agricultural Implement Workers of America v. Defiance Industries, Inc.,* 251 F.Supp. 650 (N.D.Ohio 1966).

Plaintiffs also rely on *Heheman v. E.W. Scripps Co.,* 661 F.2d 1115 (6th Cir.1981), holding that the Cincinnati Post's lifetime employment guarantee for its printers survived when the Post shut down its presses and began composing and printing its issues at the plant of the rival Enquirer. The Post's collective bargaining agreement, however, contained no termination clause akin to paragraph 2 here; the court stressed that "[t]he guarantee of continuous employment is subject only to voluntary terminations for just cause". *Id.* at 1120, and emphasized the fact that the paper had not gone out of business. *Id.* at 1123.

4. *See supra* note 1.

The factual questions over whether a merger occurred precludes dismissal of this Count at this time.

C. *Employees' Failure to Exhaust the Collective Bargaining Agreement's Grievance Procedure.*

Press Publishing also contends that if provisions of the collective bargaining agreement survived the Press, the employees' action should be dismissed because they failed to exhaust the grievance procedure established under the agreement.[5]

◼ Employees who allege a violation of a collective bargaining agreement must at least attempt to resolve their claim through contractual grievance and arbitration procedures before suing under § 301. *Republic Steel v. Maddox,* 379 U.S. 650, 652–53, 85 S.Ct. 614, 616–17, 13 L.Ed.2d 580 (1965); *Hines v. Anchor Motor Freight, Inc., supra,* 424 U.S. at 563, 96 S.Ct. at 1055. However, exhaustion of non-judicial procedures is unnecessary when (1) the employer has repudiated the contract; or (2) the union has arbitrarily and wrongfully refused to prosecute the grievance; or (3) resort to arbitration would be futile. *Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *Glover v. St. Louis-San Francisco R. Co.,* 393 U.S. 324, 89 S.Ct. 548, 21 L.Ed.2d 519 (1969). *See, Clayton v. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America,* 451 U.S. 679, 101 S.Ct. 2088, 68 L.Ed.2d 538 (1981).

◼ Plaintiff employees claim that they attempted to use the grievance procedure when their lawyer, Robert M. Phillips, wrote a letter to Scripps, The Plain Dealer, Press Publishing and Cole on September 24, 1982, asserting their claims and "invoking the conciliation and arbitration provision of the current collective bargaining [agreement]." Complaint, Exhibit E. They claim their request was rebuffed by the publishers; even if it was not, they add, complete recovery through the grievance machinery was impossible since it had been "dismantled".

Press Publishing argues that Phillips' letter was "intended solely as a prelude to the initiation of this lawsuit" and was a "meaningless recitation, not a genuine effort to invoke the conciliation and arbitration procedure. . . ." Memorandum in Support of Motion to Dismiss, at 8. The Court finds this argument unpersuasive, and denies the motion to dismiss on this ground.

D. *Employees' Failure to Commence This Action Within Ohio's 90-day Statute of Limitations for Actions to Vacate an Arbitration Award.*

◼ Press Publishing contends finally that even if the employees' suit is not barred by the exhaustion doctrine it is forbidden by Ohio's three-month statute of limitations for actions to vacate the result of an arbitration. *See, United Parcel Service v. Mitchell,* 451 U.S. 56, 101 S.Ct. 1559, 67 L.Ed.2d 732 (1981); *Auto Workers v. Hoosier Cardinal Corp.,* 383 U.S. 696, 86

---

**5.** The grievance procedure reads as follows:

Section 2. A Joint Standing Committee shall be appointed, consisting of two representatives of the Employer and two representatives of the Union. These representatives shall be appointed by their respective organizations. All questions that may arise as to the construction to be placed on any part of this Agreement, and any controversy over discharge of help shall be referred to said committee.

Section 3. This contract alone shall govern relations between the parties on all subjects concerning which any provision is made in this contract, and any dispute involving any such subjects shall be determined in accordance with the conciliation provisions provided for herein.

Section 4. Should either party have a grievance, the same shall be presented in writing within ninety (90) days to the Joint Standing Committee for conciliation; said committee shall meet to consider said grievance within five (5) days (two days in discharge appeals) after filing of same (such time may be extended by mutual agreement); if an understanding cannot be reached within ten (10) days after the grievance has been presented, then the settlement of said grievance shall be left to the Board of Arbitration. Provided that by mutual agreement the presenting of said grievance to the Board of Arbitration can be extended not to exceed thirty (30) days.

S.Ct. 1107, 16 L.Ed.2d 192 (1966). Since Press Publishing's motion to dismiss was filed, the Supreme Court has deemed the six-month statute of limitations of § 10(b) of the Labor Management Relations Act, 29 U.S.C. § 160(b), the appropriate yardstick for employee actions against employers and unions to vacate arbitrations awards. *DelCostello v. International Brotherhood of Teamsters,* —— U.S. ——, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). Defendants contend that the closing of the Press on June 18, 1982 commenced the running of the statute of limitations. This action was filed on February 28, 1983. If Press Publishing's contention is correct, either the Ohio or the federal statute of limitations would time-bar this suit.

Press Publishing cites *Badon v. General Motors Corporation,* 679 F.2d 93, 98 (6th Cir.1982), which held that a statute of limitations can be started by a "final decision" reached by a non-arbitration pension claim adjudication system contracted to by a union and employer. The employees argue that *Badon* is limited to decisions emerging from a multi-party grievance procedure. The Press' unilateral decision to close being no such procedure, they suggest that their action should be resolved under Ohio's statutes of limitations for written contracts (fifteen years, Ohio Rev.Code § 2305.06) or non-written contracts (six years, Ohio Rev. Code § 2305.07). They urge this Court to follow *Dent v. United States Postal Service,* 538 F.Supp. 1079 (1982). Dent sued the Service and his union for wrongful failure to reinstate him based on race and handicap discrimination. The court refused to apply the 90-day award for actions to vacate arbitration awards:

> The action before us today, however, cannot be characterized as an action to vacate an arbitration award.... [T]his is an action against plaintiff's employer for breach of a written agreement to reinstate him if he fulfilled certain conditions ... We recognize that plaintiff's action is based on the Labor Act, but under the authority of *Mitchell,* we find that the most appropriate state law to apply is the Ohio six-year statute of limi-

tations for breach of contract.... We would not apply the longer fifteen-year statute of limitations for breach of a written contract because this action is based in part on the common-law duty of the Union and the application of the fifteen year statute of limitations would clearly interfere with the rapid resolution of labor disputes.

538 F.Supp. at 1083.

We find the employees' suggestion that *Dent* controls this case correct and Press Publishing's argument on this Count wholly spurious. We deny the motion to dismiss on this ground as well.

## II. THE ANTITRUST CLAIMS

█ Private parties may bring actions for violations of antitrust laws under Section 4 of the Clayton Act, 15 U.S.C. § 15, which provides that:

> Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

"On its face, § 4 contains little in the way of restrictive language." *Reiter v. Sonotone Corp.,* 442 U.S. 330, 337, 99 S.Ct. 2326, 2330, 60 L.Ed.2d 931 (1979). "The statute does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers.... The Act is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated." *Mandeville Farms v. Sugar Co.,* 334 U.S. 219, 236, 68 S.Ct. 996, 1006, 92 L.Ed. 1328 (1948); *Blue Shield of Virginia v. McCready,* 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982). But "the mere fact that the claim is literally encompassed by the Clayton Act does not end the inquiry." *Associated General Contractors of California v. California State Council of Carpen-*

*ters,* —— U.S. ——, ——, 103 S.Ct. 897, 908, 74 L.Ed.2d 723 (1983). Since *Hawaii v. Standard Oil Co.,* 405 U.S. 251, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972), the Court has drawn on statutory policy to restrict standing under § 4. In *Associated General Contractors,* it conceded that no simple standing rule can be formulated, and enunciated a multi-factor approach for lower courts to follow on a case-by-case basis. 103 S.Ct. at 908 n. 33.

 Those factors include (1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff as consumer or competitor in the relevant market; (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation. 103 S.Ct. at 908–13. The Sixth Circuit has adopted this test. *See Southaven Land Co. v. Malone & Hyde, Inc.,* 715 F.2d 1079, 1084, (6th Cir.1983).

*McCready* indicates that questions of antitrust injury and directness should dominate the court's analysis:

> ... [W]e [must] look (1) to the physical and economic nexus between the alleged violation and the harm to the plaintiff, and, (2) more particularly, to the relationship of the injury alleged with those forms of injury about which Congress was likely to have been concerned in making defendant's conduct unlawful and in providing a private remedy under § 4.

102 S.Ct. at 2548.

### A. Causation and Intent

 As noted earlier, Counts IV and V of this action allege that The Plain Dealer, Press Publishing, and Cole entered into an antitrust conspiracy that had two distinct goals: (1) creating a monopoly for The Plain Dealer in the Greater Cleveland daily and Sunday newspaper market, and (2) terminating Press Publishing's contractual obligation to provide lifetime employment and benefits to the Press employees under the job security agreement. The second prong of the alleged conspiracy defines the employees as intended victims of the conspiracy and satisfactorily posits a causal connection between the monopolization and the employees' injuries.

### B. Antitrust Injury

Plaintiffs only have antitrust standing if their "injury was of a type that Congress sought to redress in providing a private remedy for violations of antitrust laws." *Blue Shield of Virginia v. McCready, supra,* 102 S.Ct. at 2550; *Associated General Contractors, supra,* 103 S.Ct. at 909.

The concept of "antitrust injury" originated with *Brunswick v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1976). The Court rejected an antitrust action brought by the owners of three independent bowling centers, who alleged that Brunswick violated § 7 of the Clayton Act when it purchased and operated financially failing bowling lanes in competition with them. The Court turned down their claim for damages based on lost profits, and refused to "authorize damages for losses which are of no concern to the antitrust laws." *Id.* at 487, 97 S.Ct. at 696.

> ... Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.

*Id.* at 489, 97 S.Ct. at 697.

*Blue Shield of Virginia v. McCready* found an antitrust injury in a woman's challenge to Blue Shield's policy of reimbursing subscribers for psychotherapy conducted by psychiatrists but not for similar clinical treatment by psychologists. Rejecting the argument that only competitors can raise antitrust claims, the Court held that "[a]lthough McCready was not a competitor of the conspirators, the injury she suffered was inextricably intertwined with the inju-

ry the conspirators sought to inflict on psychologists and the psychotherapy market." 102 S.Ct. at 2551.

*Associated General Contractors,* in turn, denied standing to two union groups which alleged that a multi-employer association injured them and breached a collective bargaining agreement by coercing association members and some third parties to deal with non-union contractors and subcontractors. The challenged activities allegedly reduced union dues by diminishing the business of the unionized firms, and the wages of union workers. Standing was denied because the unions were "neither a consumer nor a competitor in the market in which trade was restrained", 103 S.Ct. at 897, and because "a union, in its capacity as bargaining representative, will frequently not be a part of the class the Sherman Act was designed to protect, especially in disputes with employers with whom it bargains." *Id.* at 910.

... In this case it is appropriate to focus on the nature of the plaintiff's alleged injury. As the legislative history shows, the Sherman Act was enacted to assure *customers* the benefits of price competition, and our prior cases have emphasized the central interest in protecting the economic freedom of *participants* in the relevant market.

*Id.* at 908–09.

In *Southaven* the owner of retail commercial space (Southaven) leased the premises to a wholesale grocery concern (Malone), which in turn sublet the space to various unsuccessful retail grocers. Southaven requested that Malone cancel the lease. Malone orally agreed, but breached the contract after learning that Southaven planned to re-lease the space to another retail grocer. It also removed its equipment from the store, allegedly delaying the opening of another grocery there and perpetuating its own retail grocery monopoly. Southaven alleged that it had been injured by conducting contract negotiations with an antitrust violator. The district court dismissed and the Sixth Circuit affirmed:

... Southaven is not alleged to be a member of a class of "consumers" of grocery products or a class otherwise manipulated or utilized by Malone as a fulcrum, conduit or market force to injure competitors or participants in the relevant product and geographical markets. Although Southaven's injury may be a tangental [sic] by-product of Malone's averred monopolistic conduct, such injury is not *inextricably* intertwined to any injury inflicted upon the relevant market. Accordingly, Southaven is not a consumer, customer, competitor or participant in the relevant market or otherwise inextricably intertwined with any such entity. Its injury is not sufficiently linked to the pro-competitive policy of the antitrust laws.

715 F.2d at 1086 (emphasis in original).

In the present case, defendants contend that the displaced employees, as "neither consumers nor competitors" in the Greater Cleveland newspaper market, are not within the class the antitrust laws are intended to protect, suffered no antitrust injury, and may only sue under the collective bargaining agreement. Plaintiffs view the loss of their jobs as a direct consequence and a goal of the monopolization.

A number of cases, not challenged in any of the recent decisions on antitrust standing, hold that loss of employment can constitute an injury to "business or property" and provide standing under § 4. *Radovich v. National Football League,* 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957) allowed a professional football player, barred from playing in the NFL because he had performed in a rival league, to bring a treble damage action challenging the boycott of players from that league. Reversing a dismissal of the complaint, the Court held Radovich's allegations of Sherman Act violations sufficient to permit him the opportunity to prove his charges. *Radovich* has been followed in a number of subsequent cases. *Nichols v. Spencer International Press,* 371 F.2d 332, 334 (7th Cir.1967) permitted employees to challenge a "nonswitching" agreement under which publish-

er-employees contracted not to hire each other's employees until six months after any previous employment ended. "[T]he interest invaded by a wrongful act is so closely akin to the interest invaded by impairment of one's business as to be indistinguishable in this context." The Fifth Circuit likewise reversed the dismissal of a suit by a securities salesman who alleged blacklisting by securities dealers, *Quinonez v. National Association of Securities Dealers, Inc.*, 540 F.2d 824, 827, 828–830 (1976). *See also, Dailey v. Quality School Plan, Inc.*, 380 F.2d 484 (5th Cir.1967); *Tugboat, Inc. v. Mobile Towing Co.*, 534 F.2d 1172, 1176 (5th Cir.1976); *Roseland v. Phister Manufacturing Co.*, 125 F.2d 417 (7th Cir.1942); *Vines v. General Outdoor Advertising Co.*, 171 F.2d 487, 491 (2d Cir.1948); *McNulty v. Borden, Inc.*, 474 F.Supp. 1111 (E.D.Pa. 1979); *DeGregorio v. Segal*, 443 F.Supp. 1257, 1261 (E.D.Pa.1978).

The *Associated General Contractors* court noted that standing is denied "to employees with merely derivative injuries." 103 S.Ct. at 910 n. 46. A leading case cited by the court, *Reibert v. Atlantic Richfield Co.*, 471 F.2d 727, 730–31 (10th Cir.), *cert. denied*, 411 U.S. 938, 93 S.Ct. 1900, 36 L.Ed.2d 399 (1973) denied standing to employees who lost their jobs after an allegedly illegal merger. The Tenth Circuit wrote:

> Antitrust violations admittedly create foreseeable ripples of injury to individual stockholders, consumers and employees, but the law has not allowed any of these standing to sue ........ Termination of employment will often occur whether a merger is legal or illegal. It is the natural effect flowing from two similarly structured businesses combining their assets to maximize efficiency ... the loss of their rights of employment is not a result of any lessening of commercial competition.

471 F.2d at 731. *Reibert* distinguished *Radovich* as a case that "allege[d] antitrust violations directed at the blackballed party." *Id.* The Seventh Circuit recently took the same tack when it denied standing to an employee whose antitrust action alleged that he was fired and blacklisted because he refused to participate in a conspiracy to fix prices, impose conditions of sale on customers, and allocate customers. *In re Industrial Gas Antitrust Litigation (Bichan v. Chemetron Corp.)*, 681 F.2d 514, 517 (7th Cir.1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 1261, 75 L.Ed.2d 487 (1983). *See Thomsen v. Western Electric Co., Inc.*, 680 F.2d 1263 (9th Cir.1982); *Stein v. United Artists Corp.*, 691 F.2d 885 (9th Cir.1982); *Pitchford v. PEPI, Inc.*, 531 F.2d 92, 97 (3rd Cir.), *cert. denied*, 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976). But the *Industrial Gas* court acknowledged the continuing validity of *Radovich* and *Nichols*, distinguishing them because "the conspiracies in both cases were intended to restrict competitive conditions in the labor market, [and] the injuries complained of, restriction of employment opportunities, were directly related to the anticompetitive effects." *Id.* at 517.

The district court in *Heheman v. Bell*, [1978–1] Trade Cas. (CCH) ¶ 61,975, at 74,-145 (S.D.Ohio 1978), *rev'd on other grounds*, 661 F.2d 1115 (6th Cir.1981), the Cincinnati Post case discussed *supra*, relied on *Reibert* in dismissing the employees' antitrust action against the Post and Enquirer.

> There is no doubt that the plaintiffs will suffer harm or injury in fact if the Joint Agreement be carried out. However, economic harm sustained by those, such as plaintiffs, outside the target areas is not antitrust injury and, for that reason, the plaintiffs lack standing. The motion to dismiss as to Count I is well taken and should be sustained.

*Id.* at 74,148.

We decline to follow this ruling. The court did not discuss, nor does it appear the plaintiffs raised, the *Radovich-Nichols* line of cases. We view those cases, holding that a Sherman Act conspiracy directed at employees provides them with antitrust standing, as controlling. They involve precisely the kind of "inextricably entwined" injury held actionable in *McCready* and *Associated General Contractors*. As we read the complaint, one goal of the conspiracy between

the publishers was to terminate the plaintiffs' job security agreement. Unlike *Reibert* and similar cases, where the corporate employer was the target of the monopolization effort and the employee a derivative victim, here the employer, the Press, is alleged to be no victim but rather a party to the conspiracy, and the employees, like Radovich, the targets. We find this a sufficient allegation of antitrust injury.

## C. Directness of Injury

A closely related element of antitrust standing analysis is what the Supreme Court has called "the directness or indirectness of the asserted injury," *Associated General Contractors, supra,* 103 S.Ct. at 910, alternately "the physical and economic nexus between the alleged violation and the harm to the plaintiff." *Blue Shield of Virginia v. McCready, supra,* 102 S.Ct. at 2548.

In *Associated General Contractors,* the court held that the connection between the multi-employer association's actions and the union's loss of dues was too remote to give the union standing. "It is obvious that any such injuries were only an indirect result of whatever harm may have been suffered by 'certain' construction contractors and subcontractors." *Id.* 103 S.Ct. at 910. Only those parties and other "immediate victims of coercion" suffered direct injuries and could sue the association. "Other than the alleged injuries flowing from breaches of the collective bargaining agreements—injuries that would be remediable under other laws—nothing but speculation informs the Union's claim of injury by reason of the alleged unlawful coercion." *Id.* at 911. In *Southaven,* plaintiffs also failed to "plead that Malone's alleged breach of contract caused Southaven financial disadvantage." 715 F.2d at 1087.

■ Defendants here assert that suits by employees are, as a general proposition, "too 'indirect,' 'secondary' or 'remote'." *In re Industrial Gas Antitrust Litigation, supra,* 681 F.2d at 519–20. *Radovich,* however, demonstrates that employee injury is, in some situations, the direct consequence of defendants' activities. Plaintiffs distinguish *Associated General Contractors* as a

case where the union was suing for its own injuries, not those of its members, and state more generally that there is a direct link between monopolization of the newspaper market and their damages, with no intervening third parties. We find this situation considerably different from *Associated General Contractors* and hold that plaintiffs have alleged a sufficiently direct connection between the conspiracy and their injuries to survive a motion to dismiss.

## D. More Direct Victims

■ Another factor which must be considered under *Associated General Contractors* is "the existence of more direct victims of the alleged conspiracy...." *Id.* 103 S.Ct. at 913. That court found the contractors and subcontractors who lost work because of the defendant's acts more appropriate plaintiffs than the unions. Similarly, the Sixth Circuit found both consumers and participants in the grocery market to be "obviously more direct victims" of Malone's antitrust violations than Southaven. 715 F.2d at 1086–1087. The publishers argue that, since the alleged antitrust violation involved monopolization of the Cleveland newspaper market, both advertisers and subscribers and potential competitors are more appropriate plaintiffs than the displaced employees. Plaintiffs again claim to be intended victims of the conspiracy and note that the parties suggested by the defendant have little interest in pursuing a suit. We find their point well-taken.

## E. Potential for Double Recovery

■ The last factor to be considered under the *Associated General Contracts* test is the possibility of duplicative recovery and complex apportionment of damages if a suit is permitted to go forward. 103 S.Ct. at 911–12. *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977) held that damages could not be recovered by purchasers indirectly overcharged because their suppliers were the victims of price-fixing, because plaintiffs would be challenging the original victims for the same funds.

Defendants suggest that a similar potential for duplicative recovery and complex apportionment of damages exists here because (1) directly victimized potential competitors, subscribers, and advertisers could bring suit; and (2) the employees possess a cause of action under § 301. Plaintiffs contend, correctly we think, that they seek recovery for injuries distinct from any suffered by other potential parties. As for the second point, we do not believe that the existence of a cause of action under § 301, in itself, outweighs the other factors in the *Associated General Contractors* test so as to compel dismissal of the antitrust counts in the complaint.

The employees' complaint alleges a causal connection between the antitrust conspiracy and their injury, sets forth a plausible claim of antitrust injury, and links the degree of injury directly to the alleged conspiracy. They have satisfied the most important elements of the *Associated General Contractors-Southaven Land Co.* test and alleged facts sufficient to overcome the motions to dismiss the antitrust claims.

For the foregoing reasons, each motion to dismiss the complaint and each motion for summary judgment is denied.

IT IS SO ORDERED.