James R. PROVINCE, et al., Plaintiffs,

v.

CLEVELAND PRESS PUBLISHING COMPANY, et al., Defendants,

v.

CLEVELAND TYPOGRAPHICAL UNION NO. 53, et al., Third Party Defendants.

Ronald RIDLEY, et al., Plaintiffs,

v.

PLAIN DEALER PUBLISHING COMPANY, et al., Defendants.

Civ. A. Nos. C83–847, C84–2145.

United States District Court, N.D. Ohio, E.D.

March 20, 1985.

Robert M. Phillips, Stanley B. Weiner, Landskroner & Phillips Co., L.P.A., Cleveland, Ohio, for plaintiffs.

Jon C. Flinker, Craig M. Brown, Duvin, Flinker & Cahn, Cleveland, Ohio, for Cleveland Press Publishing Company (labor law issues).

Robert M. Goodman, Gail Sindell, Barbara Friedman Yaksic, Benesch, Friedlander, Coplan & Aronoff, Cleveland, Ohio, for Cleveland Press Publishing Company and Joseph E. Cole (antitrust issues).

Parker M. Orr, David G. Holcombe, Baker & Hostetler, Cleveland, Ohio, for The E.W. Scripps Company.

James P. Garner, Baker & Hostetler, Cleveland, Ohio, Williams E. Willis, Richard J. Urowsky, Sullivan & Cromwell, New York City, and Tobias J. Bermant, Sabin, Bermant & Blau, New York City, for Plain Dealer Publishing and S.I. Newhouse, Jr.

Lawrence M. Oberdank, Laybourne, Smith, Oberdank, Gore & Shapiro, Cleveland, Ohio, for Cleveland Typographical Union No. 53 and Haven Combs.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

These cases allege that the June 17, 1982 closing of the Cleveland Press daily afternoon newspaper was the product of a conspiracy between the publishers of the Press and The Plain Dealer, Cleveland's sole surviving daily paper. Eighty-nine former Press employees allege that the transactions surrounding the paper's closing violated federal labor and antitrust laws and Ohio common law.

On September 1, 1983, this Court denied various defendants' motions to dismiss or for summary judgment in *Province v. Cleveland Press Publishing Co.*, No. C83–847 (N.D.Ohio filed Feb. 28, 1983). *See* 571 F.Supp. 855 (N.D.Ohio 1983). The same plaintiffs later commenced *Ridley v. Plain Dealer Publishing Co.*, No. C84–2145 (N.D.Ohio filed July 3, 1984). This Court consolidated the actions pursuant to Fed.R. Civ.P. 42(a) and the parties have completed exhaustive discovery. Now pending are cross-motions for summary judgment filed pursuant to Fed.R.Civ.P. 56. Applying binding appellate precedent to undisputed material facts compels the conclusion that plaintiffs possess no claims which could properly be submitted to a jury. This Court accordingly must grant defendants' motions for summary judgment and dismiss the *Province* and *Ridley* complaints.

Subject matter jurisdiction rests on 28 U.S.C. §§ 1331 and 1337, 29 U.S.C. § 185, 15 U.S.C. § 15, and the doctrine of pendent jurisdiction.

## I. THE FACTS

A.

In 1972 two daily newspapers served the Greater Cleveland area. E.W. Scripps Co. ("Scripps") owned and operated the Press. Plain Dealer Publishing Company ("Plain Dealer"), then known as Forest City Publishing Company, published The Plain Dealer. Prior to 1972, Scripps and Plain Dealer were separate parties, on a multi-employer basis, to a collective bargaining agreement with the Cleveland Typographical Union, Local No. 53 ("the Union" or "CTU No. 53").

On January 17, 1972, as the agreement covering the period from June 1, 1969 to August 31, 1972 was nearing its end, the two publishers and the Union signed a Job Security Agreement and Memorandum of Clarification ("Job Security Agreement"). Each publisher guaranteed its eligible

workers lifetime employment. The pertinent paragraphs provided:

THIS AGREEMENT, entered into this 17th day of January, 1972 by and between The E W Scripps Company, as publisher of The Cleveland Press, and The Forest City Publishing Company, as publisher of The Plain Dealer (hereinafter referred to as "the Publishers") acting through the Cleveland Newspaper Publishers Association as joint Negotiating Agent for the Publishers, and Cleveland Typographical Union No 53, by officers duly authorized to act in its behalf (hereinafter referred to as the "Union"); and is made to resolve certain long-standing controversies and for the good and welfare of all parties. In consideration of the mutual promises and considerations contained herein, the parties hereto agree as follows:

\* \* \* \* \* \*

2. Each eligible employe listed on the Job Security Roster will be entitled to a regular full-time job in the bargaining unit of employes represented by the Union ... for the remainder of his working life until such employe dies, retires, or resigns; provided, however, that in the event the Publishers, or either of them, permanently cease publication that such employment guarantee will thereupon cease, and provided further, that during any period of temporary suspension by the Publishers, or either of them, the job guarantee will be suspended for such period of temporary suspension of publication with respect to the Publisher or Publishers who have ceased or suspended publication ...

3. In the event that either or both Publishers merge with any other publisher or is acquired or consolidates its business in any manner or changes its operation in any manner, such change of circumstance will in no manner abrogate or alter this Agreement and any successor employer, publisher, company, or enterprise will be as fully bound by the terms of this Agreement as if such changed enterprise had been an original party hereto.

Current and former Press and Plain Dealer executives have submitted uncontroverted affidavits stating that the Job Security Agreement was intended to require *each* publisher to guarantee lifetime employment for *its* eligible employees.[1] Separate lists of protected employees at the two newspapers were attached to the Job Security Agreement; transfers between the lists were not permitted.

The Job Security Agreement was incorporated by reference into subsequent multi-employer collective bargaining agreements, the last of which become effective on January 1, 1978 and was to expire on December 31, 1983 ("Collective Bargaining Agreement"). On several occasions subsequent to 1972, the Union and the publishers negotiated supplemental agreements providing lucrative incentives to employees who agreed to surrender their lifetime-guaranteed jobs and retire ahead of schedule. As workers accepted these payments, the number of Press and Plain Dealer employees covered by the respective Job Security Agreements shrank.

During the term of the 1978 Collective Bargaining Agreement, Scripps began negotiating to sell the Press to Cleveland Press Publishing Co. ("Press Publishing"). Its president, Joseph Cole, owned a majority of the new entity's stock. In August of 1980, Cole met with Union representatives to discuss the possibility of negotiating new collective bargaining agreements or modifications in the existing agreements, if he purchased the paper. With respect to production personnel, he submitted a proposal to Haven Combs, president of CTU No. 53, which was reviewed by an International Typographical Union ("ITU") representative and approved in writing by ITU.

---

1. *See* affidavits of William A. Holcombe, who was assistant to the business manager at the Press in 1972 and business manager from 1976 to 1981; Leo Ring, assistant to the business manager at The Plain Dealer; and William F. Stewart, chairman of the Press "chapel" at the Union in 1972.

Combs presented the "final agreement" proposal to the Union at a meeting on September 21, 1980. By a vote of ninety to nineteen, the members approved a proposal which included the following language.

1. New three-year collective bargaining contract (pre-ratified) effective January 1, 1981 through December 31, 1983 which will supersede all existing contracts, letters of agreement, etc.

2. The current collective bargaining contract between your Union and The Cleveland Press will be extended and made a part of the new three-year contract referred to in 1 above, except for the following amendments:

A The current job security agreement will remain in full force and effect and the 1980 Termination Incentive Program implemented by The Plain Dealer will also be accepted . . .

Combs and Press Publishing thereafter signed letter agreements dated October 15, 1980 and October 29, 1980. The October 15, 1980 letter states in pertinent part:

The Cleveland Press Publishing Company, a corporation organized by Joseph Cole, is in the final stage of acquiring The Cleveland Press from The E.W. Scripps Co., and a condition of the sale is that Purchaser shall present to Seller duly executed agreements with all unions superseding the contracts in effect between the Seller and said Unions. Of course, it is our intention, as soon as time permits, to prepare full collective bargaining contracts and all supplements thereto between The Cleveland Press Publishing Company and all Unions, but this job cannot be completed by closing date.

Therefore, this letter shall constitute a memorandum of agreement between your Union and The Cleveland Press Publishing Company as follows:

1. The Cleveland Press Publishing Company shall assume (on a single employer basis) the current contract and all written supplements thereto between your Union and The Cleveland Press, and the duration of the new contract between your Union and the Cleveland Press Publishing Company shall be from the date of acquisition through December 31, 1983.

The October 29, 1980 document is a release supplanting, superseding, and terminating all relations between Scripps and the Union. It states in part:

It is understood and agreed by the undersigned that on the Closing Date of the sale of The Cleveland Press to The Cleveland Press Publishing Company (a corporation organized by Joseph Cole), the collective bargaining agreement negotiated by The Cleveland Press Publishing Company and Cleveland Typographical Union No. 53 will become effective, will supersede and supplant the collective bargaining agreement between The E.W. Scripps Company and Cleveland Typographical Union No. 53 and that The E.W. Scripps Company from the Closing Date forward shall not be a party to any collective bargaining agreement with the Union.

Combs stated that he executed the letter agreements as authorized by the September 21, 1980 vote approving the proposals to negotiate a new three-year collective bargaining agreement with Press Publishing. The letter proposals signed by Combs were not formally submitted to CTU No. 53 nor to the ITU for ratification.[2] In his deposition, Combs stated that both letters were read to the Union membership and no objection was made. He conceded that the

---

2. Article VII, section 4 of the ITU's 1974 bylaws states:

No local union shall sign a contract guaranteeing its members to work for any proprietor, firm or corporation, unless such contract is in accordance with International law and policy and is approved as such by the International President. The officers, committees and members are expressly prohibited from submitting to a union for vote or voting on any proposal of an employer or committee for a contract either written, verbal or implied which has not previously been approved by the International President as being in compliance with ITU laws and policy and not in violation of civil laws.

documents contained material which probably should have been approved by the Union membership, "not for legal reasons" but as a "courtesy" and a "political move." Although Press Publishing sent a proposed collective bargaining agreement to Combs on November 24, 1981, it too was never formally ratified.

On October 31, 1980, Scripps and Press Publishing executed the Agreement for the Sale of the Cleveland Press under which Scripps sold the Press to Press Publishing. The parties believed that the letter agreements between Press Publishing, Scripps and Combs satisfied paragraph 6.5 of the sale agreement, which provided:

Seller also shall have received true copies of duly executed agreements between (i) Purchaser and the unions listed below and (ii) Seller and said unions, which, taken together, shall provide that Purchaser and each of said unions have entered into labor agreements superseding and supplanting the contracts in effect between Seller and each of the named Unions and that the labor contracts currently in effect between Seller and each of said unions are terminated and of no further force and effect.

Press Publishing acquired the Press in return for $1 million in cash and a $7 million promissory note. Cole and Kenneth Johnson, who was originally Press Publishing's minority shareholder, estimated that the fair market value of the assets Press Publishing acquired pursuant to the agreement was between $10 million and $12 million. The agreement allocated the purchase price among accounts receivable, the Press' physical personal property, and its real property. No values were assigned to the Press' library or its subscription list.

With the closing of the Scripps-Press Publishing transaction, Scripps stopped publishing the Press, Press Publishing commenced operations, and the October 29, 1980 letter agreement terminating the Union-Scripps relationship took effect. Union employees continued to publish the Press and performed under the terms contained in the October 15, 1980 letter agreement between Combs and Press Publishing, and under the Collective Bargaining Agreement. Scripps played no further role in operating the Press or in managing the newspaper's employees.

B.

When Press Publishing took over the Press on October 31, 1980, it introduced various changes in the newspaper's format and style in an effort to increase circulation and profits. Among the improvements noted by Cole were a Sunday edition, a morning street sale edition, a magazine oriented towards younger readers, circulation and promotion drives, and increased use of color in the paper's graphics.

Monthly operation statements reveal that between November of 1980 and August of 1981, the Press lost approximately one-half million dollars each month. By late 1981, according to Cole and James P. Maloney, Jr.—a consultant who became a minority shareholder in Press Publishing at that time and was actively involved in managing the paper—losses had increased to between $750,000 and $1 million each month and Press Publishing had exhausted its credit.

Shortly after it began operating the Press, Press Publishing approached Plain Dealer management concerning relations between the competing newspapers. In December of 1980, Cole arranged a meeting with Samuel I. Newhouse, Jr., the chairman of the board of Advance Publications, Inc., the parent company which controls Plain Dealer. They met at Cole's house in Florida, where Cole proposed some form of "collaboration" between the newspapers. Newhouse stated at his deposition that he told Cole that a joint operating agreement would not solve the Press' problems or benefit either paper.

In November of 1981, Cole called Newhouse in New York City and suggested another meeting in Florida. Cole discussed the Press' significant losses and again proposed a joint operating agreement. Newhouse again stated that he did not believe collaboration to be a good idea. At approximately the same time, Press Publishing approached other newspaper publishers un-

successfully seeking to persuade them to invest in the Press. In addition, Cole and Maloney formed Lakeside Associates, an Ohio limited partnership, which then purchased the Press' real property.

As 1982 began, Press Publishing commenced several new courses of action. One involved circulation. In February of 1982, the Press abandoned its solicitation of potential subscribers and assigned the task to a newly-formed Ohio corporation, Del-Com, Inc. Maloney held all of the 1,000 shares of no par value common stock. Del-Com's stated capital was $500.00 on its date of incorporation, February 25, 1982. Maloney then transferred forty-nine percent of the stock to Cole, retaining fifty-one percent. Del-Com solicited subscriptions and advertising for the Press through what Maloney termed "computer-based telemarketing." It also began publishing an advertising supplement, the Rainbow Express, which was both included in the Press and delivered separately to non-subscribers. The supplement originally was produced with the assistance of Press employees and facilities. Lacking any substantial initial capital, Del-Com commenced operations by securing a loan from National City Bank; it invested approximately $100,000 to purchase computer lists from a Columbus firm, which it used to generate the lists of Press non-subscribers who were to receive Rainbow Express.

Press Publishing simultaneously turned its attention from finding new investors in the Press to finding a buyer for the newspaper. It commissioned Edward R. Padilla, a communications consultant and former vice president of the newspaper division of the Washington Post Company, to find a buyer. Padilla contacted six potential buyers, but by May of 1982 advised Press Publishing that none were interested in purchasing the paper. Maloney's subsequent efforts to find a buyer were also unsuccessful.

C.

The data concerning the financial plight of the Press in the spring of 1982 is decidedly mixed. On the one hand, Press Publishing sustained operating losses of $751,957 in April and $703,704 in May. After Cole and Maloney borrowed an additional $2 million, the two men decided not to put any more of their personal funds into the newspaper. At the same time, an April 7, 1982 Press Publishing memorandum on the company's future projected monthly profits, from $49,720 in April up to $401,620 in August.

During the same period contacts between Press Publishing and Plain Dealer resumed. Cole had met with Newhouse again on March 19, 1982 and had received another negative response to his request for a joint operating agreement. According to the Newhouse and Cole depositions, Cole then told Newhouse that he was considering shutting down the Press and offered to sell the newspaper's assets to the Plain Dealer; Newhouse told Cole he would not discuss a sale until Cole was certain he was closing the Press. After the meeting, Newhouse decided Plain Dealer was not interested in the Press' equipment but was interested in its subscription list, which would enable Plain Dealer "to maximize the recovery of circulation from the Press ..." Newhouse assigned the list a value of between $13 million and $15 million. However, several newspaper officials—including Charles Griner, circulation director of the Press in 1982, and John Malone, a publisher who sought to buy the Press, see Part I–D, infra —characterized the subscription list as essentially valueless.

On May 13, 1982, Cole and Newhouse met again in New York, this time with Maloney present. After Cole announced that the Press would be closed, Newhouse offered $14.5 million for the subscription list. Newhouse did not explain how he arrived at the figure, and claims that he was not aware that he was offering $14.5 million for the subscription list even though Press Publishing had paid only $8 million (and only $1 million in cash) to buy the entire Press operation, including the subscription list, from Scripps. Cole and Newhouse testified that they did not discuss the

Job Security Agreement; Newhouse insisted that he was not familiar with that portion of the Collective Bargaining Agreement. Maloney testified that labor costs were discussed generally during conversations about Cole's proposal for a joint operating agreement.

During the meeting, Newhouse and Maloney discussed Del-Com, and Newhouse expressed an interest in purchasing the fledgling company. Newhouse testified that, at the conclusion of the meeting, he thought he had made an offer for the subscription list which Cole had accepted, and also had expressed an interest in Del-Com. Cole testified that he left the meeting still free to find another buyer for the entire Press operation. Maloney said that the consultant, Padilla, was still working on a last-ditch "survival plan" for the Press in the third week of May.

In the weeks after the May 13, 1982 meeting, discussions took place concerning both the salvation and the termination of the Press, with the latter option increasingly favored by Press Publishing management. While Cole and Newhouse presented considerably different versions of the understandings they carried away from the meeting, in mid-May of 1982 their lawyers immediately sought to codify the discussions into a series of sale agreements. The first two drafts, dated May, 1981, offer $14.5 million for the subscription list and "personal property" of the Press, undefined except insofar as the printing press was expressly excluded. The third draft, dated June of 1982, provides that on the second day after the Press notified Plain Dealer of its intention to terminate, the latter will purchase unspecified assets and assist the Press "in connection with the termination of its operations." A June 7, 1982 refinement of this agreement contains a provision under which Plain Dealer would make the subscription list available to any party wishing to resume publication of the Press. No charge is mentioned for the use of this $14.5 million subscription list.

Subsequently, references to the Press' personal property and to assistance provided with respect to its termination were deleted from the draft agreements, which were reduced to a simple sale of the subscription list for cash. On June 10, 1982, Newhouse and Cole signed the following agreement:

June 10, 1982

Plain Dealer Publishing Co.
1801 Superior Avenue
Cleveland, Ohio 44114
Gentlemen:

We intend to cease publication of the Cleveland Press and to terminate its active operations after its June 17, 1982 edition. This letter confirms our understandings and, when executed by you, it shall constituted a binding agreement between you (sometimes referred to as the "Plain Dealer") and the undersigned (sometimes referred to as the "Press").

Accordingly, the Plain Dealer and Press agree as follows:

1. The Press shall cease publication and terminate operations on June 17, 1982 (last edition date June 17, 1982):

2. The Press shall sell to you and you shall purchase from the Press its Subscriber List for an aggregate price of # to be paid in cash or by certified check (but in all events, in Federal or other immediately available funds.

3. The Press shall publicly announce its determination to cease its publication and its operations and its sale of such List to the Plain Dealer.

4. The closing of the transaction described in the preceding paragraph shall be effected at a site to be agreed upon in Cleveland, Ohio, on June 18, 1982 at 9 a.m. (Cleveland time). At the closing, the following documents and funds shall be exchanged, delivered and executed:

a. The Press shall deliver to the Plain Dealer a bill of sale for said list, with warranties of title only.

b. The Plain Dealer shall deliver the funds payable to the Press.

Please confirm the foregoing by signing at the place indicated for your signature.

Very truly yours,
THE CLEVELAND PRESS PUBLISH-
ING CO.

By: /s/ Joseph E. Cole

The foregoing is agreed to:

PLAIN DEALER PUBLISHING CO.

By: /s/ S.I. Newhouse, Jr.

The subscription list transaction was concluded on June 18, 1982, when Cole signed the following Bill of Sale:

June 18, 1982

### BILL OF SALE

KNOW ALL MEN BY THESE PRESENTS that The Cleveland Press Publishing Company (the "Grantor"), for full consideration paid by the Plain Dealer Publishing Company (the "Grantee"), the receipt and sufficiency of which is hereby acknowledged, does hereby grant, bargain, sell, transfer and deliver unto the said Grantee its Subscriber List as of June 14, 1982 (a sample copy of a page of which is attached hereto as Exhibit "A", the balance of the pages of said Subscriber List is contained in two cardboard boxes marked "Subscriber List" and is being delivered or made available to the Grantee herewith).

TO HAVE AND TO HOLD the same unto the said Grantee and its successors and assigns forever.

And the said Grantor hereby covenants to and with the said Grantee and the Grantor is the lawful owner of the Subscriber List; that it is free and clear of all encumbrances whatsoever; and that the Grantor has good right to sell the same as aforesaid.

IN WITNESS WHEREOF, Joseph E. Cole, the President and Chief Executive Officer of the

Grantor has hereunto set his hand the day and year first hereinabove written.

THE CLEVELAND PRESS PUBLISH-
ING COMPANY

By: /s/ Joseph E. Cole, President

Signed and delivered
in the presence of:
/s/ [Illegible]

D.

The purchase of the subscription list was not the only purchase by Newhouse of Press-related businesses. On June 10, 1982, Newhouse, Maloney and Cole also entered into several agreements with respect to Del-Com. In a letter agreement, Newhouse and Maloney agreed that, within sixty days, Plain Dealer and Del-Com would enter into an agreement of at least one year under which Plain Dealer would replace the Press as Del-Com's primary customer. Plain Dealer also agreed to advance Del-Com's business expenses. Next, Plain Dealer loaned Del-Com—whose initial capital was $500—$1 million, at ten percent interest. Interest payments on the loan would not commence for two years. In its disclosure statement, Del-Com indicated that it would use the funds to pay off a $375,000 bank loan. It also indicated that it had lost money since its inception. Del-Com provided Plain Dealer with veto power over officers it intended to employ. Finally, in the most significant of the agreements, Newhouse, Maloney and Cole signed an "Option Agreement" which gave Cole and Maloney the option (exercisable between March 1, 1983 and April 15, 1983) to require Plain Dealer to purchase Del-Com for $8 million. The agreement also gave Plain Dealer the option to purchase Del-Com.

The pertinent transactions can be summarized as follows. In October of 1981, Scripps sold the Press (including its subscription list) to Press Publishing for $1 million in cash and a $7 million promissory note. In June of 1982, Press Publishing sold the subscription list alone to Plain Dealer for $14.5 million. In February of 1982, Del-Com was established with $500 in capital. It immediately incurred substantial debts and losses. Four months later, Plain Dealer signed with its owners a guaranteed one-year service contract including advanced expenses; a $1 million loan agreement; and an $8 million purchase option agreement, exercisable at Del-Com's option.

While the transactions were being finalized, Padilla apparently had found a possible buyer for the Press. On June 17, 1982, a Chicago publisher, John Malone, offered to purchase the paper and its equipment for $7 million. Malone stated in an affidavit that "Cole declined the offer with the explanation that his contract with Mr. Newhouse was signed, the subscription list sold, and the newspaper irrevocably shut down." Malone explained to Cole that he regarded the subscription list "to be a nearly valueless asset," and continued his efforts to buy the Press' assets and equipment. Cole refused his offer.

Press Publishing announced on June 17, 1982 that the Press was being closed. The newspaper's employees were terminated. In September of 1982 its presses were sold and shipped to Florida. The Press' building was later demolished.

E.

After the Press closed, Press Publishing settled outstanding issues under its collective bargaining agreements with all unions except CTU No. 53. Press Publishing submitted a settlement package which Union members rejected on August 11, 1982; a revised proposal was rejected on September 19, 1982. On September 24, 1982, plaintiffs' counsel in these cases wrote to Scripps, Plain Dealer and Press Publishing on behalf of "a number of constituent members and retirees of the Typographical Union, Local 53 ..." He maintained that the Collective Bargaining Agreement covering his clients remained in effect, obligating the defendants to provide them with guaranteed jobs and other benefits, including "earned and accrued vacation monies." He requested a meeting and asked that his letter be regarded "as written notice invoking the conciliation and arbitration provision of the current collective bargaining agreement, if relevant to the issues involved." Press Publishing and Scripps responded with letters terming counsel's claims meritless and rejecting his request for a meeting. No reply from Plain Dealer is part of the record.

## II. THE PLEADINGS

The *Province* action was commenced on February 28, 1983 by eighty-nine former Press production employees ("the employees") who lost their jobs after the newspaper was closed. The employees were members of the Union and protected by the Job Security Agreement.

Count I of the complaint alleges that Scripps and Plain Dealer breached "their obligations under the Job Security Agreement (paragraph 2) of providing a regular full-time job for the remainder of an employee's working life with attendant benefits," and by failing "to remit those monies due and owing as a result of earned and accrued vacation pay as contained in the basic collective bargaining agreement." Count II makes several factual allegations: that "Press Publishing and/or E.W. Scripps provided to defendant Plain Dealer the subscription list of the Cleveland Press newspapers," that Plain Dealer utilizes some former Press employees, and that "Press Publishing and/or E.W. Scripps provided to the defendant Plain Dealer the Rainbow Advertising insert concept, which insert concept continues to the present time by the defendant Plain Dealer," that "Press Publishing continues to the present as a viable Ohio corporation [and] ... provided to the defendant Plain Dealer assistance in the consolidation of the Cleveland newspaper business," and that since June 18, 1982 the employees "have not received the contractual benefits to which they are entitled by virtue of the contracts ..." It then contends that Scripps, Plain Dealer, and Press Publishing are violating the Job Security Agreement by not providing the employees full-time jobs and violating the collective bargaining agreement by not providing monies due as a result of earned and accrued vacation pay. Count III alleges that Press Publishing and Plain Dealer breached the collective bargaining agreement by failing to provide adequate severance pay to the employees. Counts I through III are brought pursuant to section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185.

Count IV and V are brought pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15. Count IV alleges that "[s]ome time shortly before June 18, 1982, the defendants, Plain Dealer, Press Publishing and Cole conspired together in restraint of trade for the purpose and with the intent of creating a monopoly in the product market of daily and Sunday newspapers for the Greater Cleveland area, and for the purpose of terminating the Job Security Agreement." It specifically contends that, under the conspiracy, "Press Publishing and Cole would forego any attempt to sell or otherwise dispose of its business to a potential competitor of the defendant Plain Dealer in return for which the Plain Dealer agreed to purchase certain assets, including but not limited to subscription lists from Press Publishing for an amount of money far in excess of the actual value of said assets." The conduct is said to constitute monopolization in violation of section 1 of the Sherman Anti-Trust Act, 15 U.S.C. § 1. Count V repeats these allegations and terms them attempts to monopolize, in violation of section 2 of the Sherman Anti-Trust Act, 15 U.S.C. § 2.

Count VI alleges that Press Publishing fraudulently conveyed real property and other assets to Lakeside Associates for the express purpose of evading Press Publishing's debts and obligations, in violation of Ohio common law.

Press Publishing, Cole, Plain Dealer and Scripps moved for dismissal or, in the alternative, for summary judgment with respect to Counts I through V of the complaint. They urged dismissal of the labor claims for procedural and substantive deficiencies and dismissal of the antitrust claims because plaintiffs lacked standing. This Court reviewed the motions under the standard that all allegations of the complaint must be taken as true and considered in the light most favorable to the plaintiffs, and that a case may not be dismissed unless the court is certain that the plaintiffs are not entitled to any relief. *Hughes v. Rowe,* 449 U.S. 5, 10, 101 S.Ct. 173, 176, 66 L.Ed.2d 163 (1980) (per curiam); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2

L.Ed.2d 80 (1957); *Westlake v. Lucas,* 537 F.2d 857 (6th Cir.1976). On consideration, it held that the complaint stated causes of action under section 301 of the LMRA and that plaintiffs' allegation that defendants conspired to terminate the Job Security Agreement provided them with standing to pursue the antitrust claims. In light of the limited discovery conducted prior to the motions, defendants' motions for summary judgment were also denied. The four moving parties then filed answers and extensive discovery commenced. Press Publishing and Scripps also filed third-party complaints against the Union and its president, Combs, demanding indemnification for any liability assessed against them under plaintiffs' labor law claims.

The same eighty-nine plaintiffs commenced the *Ridley* action in the Court of Common Pleas for Cuyahoga County on June 19, 1984 against the Plain Dealer and Newhouse. The complaint alleges that the Plain Dealer, by and through Newhouse, "intentionally and wrongfully induced the Cleveland Press to permanently cease publication of its daily newspaper and to otherwise cease newspaper operations. Such conduct was and is a tortious interference with a contractual relationship as between the Cleveland Press and plaintiffs." The defendants removed the case to this Court, where it was consolidated with *Province* by an order of July 31, 1984.

## III. SUMMARY JUDGMENT STANDARDS

Fed.R.Civ.P. 56(c) governs summary judgment motions and provides:

... The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law....

Important guidance on the nature of materials properly presented in a summary judgment pleading is contained in Fed.R. Civ.P. 56(e):

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.... The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

■ In reviewing summary judgment motions, this Court must view the evidence in the light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Hasan v. CleveTrust Realty Investors, Inc.*, 729 F.2d 372 (6th Cir.1984). "[T]he party seeking summary judgment must *conclusively* show that there exists no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." *Bender v. Southland Corp.*, 749 F.2d 1205, 1210 (6th Cir.1984) (citing *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir.), *cert. dismissed*, 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979)) (emphasis in original). In antitrust cases, summary judgment motions are disfavored, *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962), but are not prohibited. *Bouldis v. U.S. Suzuki Motor Corp.*, 711 F.2d 1319, 1324 (6th Cir.1983); *Bender v. Southland Corp.*, 749 F.2d at 1210.

## IV. PROVINCE: LABOR LAW

### A.

■ Section 301 of the LMRA grants federal courts jurisdiction to examine alleged violations of collective bargaining agreements:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). A section 301 claim must (1) allege violations of (2) a contract (3) between an employer and a labor organization. *See, e.g., Carpenters Local Union No. 1846 v. Pratt-Farnsworth, Inc.*, 690 F.2d 489, 500 (5th Cir.1982), *reh'g denied*, 696 F.2d 996 (5th Cir.), *cert. denied*, — U.S. —, 104 S.Ct. 335, 78 L.Ed.2d 305 (1983). Section 301 contemplates suits by and against individual employees, as well as between unions and employers, when disputes involve "uniquely personal" rights of employees such as wages, hours, overtime pay, and wrongful discharge. *Smith v. Evening News Ass'n*, 371 U.S. 195, 198–200, 83 S.Ct. 267, 269–270, 9 L.Ed.2d 246 (1962); *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 563–64, 96 S.Ct. 1048, 1055–56, 47 L.Ed.2d 231 (1976). Such rights must arise out of the collective bargaining agreement. *Broniman v. Great Atlantic & Pacific Tea Co.*, 353 F.2d 559, 561 (6th Cir.1965), *cert. denied*, 384 U.S. 907, 86 S.Ct. 1343, 16 L.Ed.2d 360 (1966). The plaintiffs are all union members seeking enforcement of rights arising out of their employment contract.

### 1.

■ Employee suits against employers under section 301 must surmount the procedural hurdles established by *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). While the earlier motions did not focus on these requirements and this Court did not address them, in *Vaca* the Supreme Court held that

... the wrongfully discharged employee may bring an action against his employer in the face of a defense based upon the failure to exhaust contractual remedies, provided the employee can prove that the union as bargaining agent breached its duty of fair representation in its handling of the employee's grievance.

*Id.* at 186, 87 S.Ct. at 914.

The *Vaca* Court premised its holding on the policy enunciated by section 203(d) of the LMRA, 29 U.S.C. § 173(d), that

Final adjustment by a method agreed upon by the parties is ... the desirable method for settlement of grievance disputes arising over the application or interpretation of an existing collective bargaining agreement.

The Court explained:

... In providing for a grievance and arbitration procedure which gives the union discretion to supervise the grievance machinery and to invoke arbitration, the employer and the union contemplate that each will endeavor in good faith to settle grievances short of arbitration. Through this settlement process, frivolous grievances are ended prior to the most costly and time-consuming step in the grievance procedures. Moreover, both sides are assured that similar complaints will be treated consistently, and major problem areas in the interpretation of the collective bargaining contract can be isolated and perhaps resolved. And finally, the settlement process furthers the interest of the union as statutory agent and as coauthor of the bargaining agreement in representing the employees in the enforcement of that agreement....

If the individual employee could compel arbitration of his grievance regardless of its merit, the settlement machinery provided by the contract would be substantially undermined, thus destroying the employer's confidence in the union's authority and returning the individual grievant to the vagaries of independent and unsystematic negotiation. Moreover, under such a rule, a signifi-

cantly greater number of grievances would proceed to arbitration. This would greatly increase the cost of the grievance machinery and could so overburden the arbitration process as to prevent it from functioning successfully. 386 U.S. at 191–92, 87 S.Ct. at 917 (citation and footnotes omitted). The same restrictions and rationale apply not only to arbitration disputes but to all federal court lawsuits by individual employees under section 301:

... To prevail against either the company or the Union, petitioners must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating breach of duty by the Union.

*Hines v. Anchor Motor Freight, Inc.,* 424 U.S. at 570–71, 96 S.Ct. at 1059.

... It is not enough ... for an employee ... to prove that he was discharged in violation of the collective-bargaining agreement.... [T]he indispensable predicate for ... [a § 301] action is not a showing under traditional contract law that the discharge was a breach of the collective-bargaining agreement, but instead a demonstration that the Union breached its duty of fair representation.

*United Parcel Service, Inc. v. Mitchell,* 451 U.S. 56, 62, 101 S.Ct. 1559, 1563–64, 67 L.Ed.2d 732 (1981). *See id.* at 67, 101 S.Ct. at 1566 (Stewart, J., concurring in the judgment) ("a plaintiff must prevail upon his unfair representation claim before he may even litigate the merits of his § 301 claim against the employer."); *Clayton v. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America,* 451 U.S. 679, 693, 101 S.Ct. 2088, 2097, 68 L.Ed.2d 538 (1981).

 *Vaca* permits the plaintiff-employee to sue the employer and union in one action or in separate actions. In either event, "the situation is not substantially changed," and "the result should be no different if the employee ... sues the employer and the union in separate actions." 386 U.S. at 187, 87 S.Ct. at 915. *Vaca* "converts what would otherwise be a sim-

ple breach-of-contract action into a three-ring donnybrook," *id.* at 210, 87 S.Ct. at 927 (Black, J., dissenting), but its requirement that an employee plead and prove misconduct by the union is nonwaivable and cannot be eluded simply by suing only the employer. The employees' contention to the contrary—based solely on *Smith v. Evening News Ass'n,* a case decided five years before *Vaca,* in which employees sued an employer without making or sustaining charges against their union—contradicts nearly two decades of clear case law. Failure to allege that the Union breached its duty of fair representation deprives the plaintiffs of a cause of action under section 301.

2.

■ In addition, plaintiffs apparently concede that the present record could not support an allegation that the Union breached its duty of fair representation. The Sixth Circuit has held that *Vaca* sets forth a three-pronged standard for determining whether a union has unfairly represented one of its members:

> A union must conform its behavior to each of these three separate standards. First, it must treat all factions and segments of its membership without hostility or discrimination. Next, the broad discretion of the union in asserting the rights of its individual members must be exercised in complete good faith and honesty. Finally, the union must avoid arbitrary conduct. Each of these requirements represents a distinct and separate obligation, the breach of which may constitute the basis for civil action.

*Ruzicka v. General Motors Corp.,* 523 F.2d 306, 309–10 (6th Cir.), *reh'g denied,* 528 F.2d 912 (6th Cir.1975), *on remand,* 96 L.R.R.M. 2822 (E.D.Mich.1977), *vacated,* 649 F.2d 1207 (6th Cir.), *on remand,* 519 F.Supp. 893 (E.D.Mich.1981), *aff'd,* 707 F.2d 259, 261 (6th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 424, 78 L.Ed.2d 359 (1983) (quoting *Griffin v. International Union of United Automobile Workers,* 469 F.2d 181, 183 (4th Cir.1972)). "A un-

ion's conduct may be sufficiently arbitrary to establish a breach of its duty when it handles a grievance in a 'perfunctory' manner, with caprice, or without rational explanation.... The employee need not necessarily show bad faith, yet mere negligence or mistaken judgment is insufficient to establish a breach of the union's duty." *Poole v. Budd Co.,* 706 F.2d 181, 183 (6th Cir.1983) (citations omitted). The present record contains no evidence of bad faith, arbitrary conduct, negligence, or any other malfeasance by the Union.

Accordingly, given the employees' failure to satisfy the requirements of *Vaca v. Sipes,* summary judgment must be granted to Scripps, Press Publishing, and Plain Dealer on the section 301 claims. Because this procedural defect is beyond plaintiffs' ability to remedy and beyond this Court's power to waive, the defendants' other arguments in support of their motions need not be addressed. Counts I, II and III of the *Province* complaint are dismissed.

## V. PROVINCE: ANTITRUST

### A.

Private parties may bring actions for violations of antitrust laws under section 4 of the Clayton Act, 15 U.S.C. § 15, which provides that:

> Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefore in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

Both Article III of the Constitution and Congressional intent in enacting the Sherman and Clayton Acts mandate limitations on which private parties can bring antitrust actions. In its most recent analysis of section 4, *Associated General Contractors of California v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74

L.Ed.2d 723 (1983), the Supreme Court recognized that

> ... A literal reading of the statute is broad enough to encompass every harm that can be attributed directly or indirectly to the consequences of an antitrust violation. Some of our prior cases have paraphrased the statute in an equally expansive way. But before we hold that the statute is as broad as its words suggest, we must consider whether Congress intended such an open-ended meaning.

*Id.* at 529–30, 103 S.Ct. at 904. Acknowledging "that the judicial remedy cannot encompass every conceivable harm that can be traced to the alleged wrongdoing," the Court found that "the mere fact that the claim is literally encompassed by the Clayton Act does not end the inquiry." *Id.* at 537, 103 S.Ct. at 908. Rather, it set forth a multi-factor approach for lower courts to use on a case-by-case basis to determine whether a plaintiff has standing to bring an antitrust suit. In its earlier opinion, this Court summarized the *Associated General Contractors* test as follows:

> Those factors include (1) the causal connection between the antitrust violation and harm to the plaintiff and whether that harm was intended to be caused; (2) the nature of the plaintiff as consumer or competitor in the relevant market; (3) the directness or indirectness of the injury, and the related inquiry of whether the damages are speculative; (4) the potential for duplicative recovery or complex apportionment of damages; and (5) the existence of more direct victims of the alleged antitrust violation. [459 U.S. at 535–44, 103 S.Ct. at 907–12] The Sixth Circuit has adopted this test. *See Southaven Land Co. v. Malone & Hyde, Inc.,* 715 F.2d 1079, 1084 (6th Cir.1983).

571 F.Supp. at 864. It also recognized that under *Blue Shield v. McCready,* 457 U.S. 465, 478, 102 S.Ct. 2540, 2548, 73 L.Ed.2d 149 (1982), courts must look

> ... more particularly, to the relationship of the injury alleged with those forms of injury about which Congress was likely

to have been concerned in making defendant's conduct unlawful and in providing a private remedy under § 4.

571 F.Supp. at 864. *See also Meyer Goldberg, Inc. of Lorain v. Goldberg,* 717 F.2d 290 (6th Cir.1983).

Turning to the question of employee standing to challenge allegedly anticompetitive transactions, this Court concluded that *Associated General Contractors* left intact a line of cases which provided standing to employees who alleged that defendants conspired to terminate their jobs:

> A number of cases, not challenged in any of the recent decisions on antitrust standing, hold that loss of employment can constitute an injury to "business or property" and provide standing under § 4. *Radovich v. National Football League,* 352 U.S. 445 [77 S.Ct. 390, 1 L.Ed.2d 456] (1957) allowed a professional football player, barred from playing in the NFL because he had performed in a rival league, to bring a treble damage action challenging the boycott of players from that league. Reversing a dismissal of the complaint, the Court held Radovich's allegations of Sherman Act violations sufficient to permit him the opportunity to prove his charges. *Radovich* has been followed in a number of subsequent cases. *Nichols v. Spencer International Press,* 371 F.2d 332, 334 (7th Cir.1967) permitted employees to challenge a "non-switching" agreement under which publisher-employers contracted not to hire each other's employees until six months after any previous employment ended. "[T]he interest invaded by a wrongful act is so closely akin to the interest invaded by impairment of one's business as to be indistinguishable in this context." The Fifth Circuit likewise reversed the dismissal of a suit by a securities salesman who alleged blacklisting by securities dealers, *Quinonez v. National Association of Securities Dealers, Inc.,* 540 F.2d [824], 827, 828–830 (1976). *See also, Dailey v. Quality School Plan, Inc.,* 380 F.2d 484 (5th Cir. 1967); *Tugboat, Inc. v. Mobile Towing Co.,* 534 F.2d 1172, 1176 (5th Cir.1976);

*Roseland v. Phister Manufacturing Co.,* 125 F.2d 417 (7th Cir.1942); *Vines v. General Outdoor Advertising Co.,* 171 F.2d 487, 491 (2d Cir.1948); *McNulty v. Borden, Inc.,* 474 F.Supp. 1111 (E.D.Pa. 1979); *DeGregorio v. Segal,* 443 F.Supp. 1257, 1261 (E.D.Pa.1978).

The *Associated General Contractors* court noted that standing is denied "to employees with merely derivative injuries." [459 U.S. 541 n. 46, 103 S.Ct. 910 n. 46]. A leading case cited by the court, *Reibert v. Atlantic Richfield Co.,* 471 F.2d 727, 730–31 (10th Cir.), *cert. denied,* 411 U.S. [938, 93 S.Ct. 1900, 36 L.Ed.2d 399].(1973) denied standing to employees who lost their jobs after an allegedly illegal merger. The Tenth Circuit wrote:

> Antitrust violations admittedly create foreseeable ripples of injury to individual stockholders, consumers and employees, but the law has not allowed any of these standing to sue. . . .
>
> . . . . Termination of employment will often occur whether a merger is legal or illegal. It is the natural effect flowing from two similarly structured businesses combining their assets to maximize efficiency . . . the loss of their rights of employment is not a result of any lessening of commercial competition.

471 F.2d at 731. *Reibert* distinguished *Radovich* as a case that "allege[d] antitrust violations directed at the blackballed party." *Id.* The Seventh Circuit recently took the same tack when it denied standing to an employee whose antitrust action alleged that he was fired and blacklisted because he refused to participate in a conspiracy to fix prices, impose conditions of sale on customers, and allocate customers. *In re Industrial Gas Antitrust Litigation (Bichan v. Chemetron Corp.),* 681 F.2d 514, 517 (7th Cir. 1982), *cert. denied* [460 U.S. 1016], 103 S.Ct. 1261 [75 L.Ed.2d 487] (1983). *See Thomsen v. Western Electric Co., Inc.,* 680 F.2d 1263 (9th Cir.1982); *Stein v. United Artists Corp.,* 691 F.2d 885 (9th Cir.1982); *Pitchford v. PEPI, Inc.,* 531 F.2d 92, 97 (3rd Cir.1975), *cert. denied,* 426 U.S. 935 [96 S.Ct. 2649, 49 L.Ed.2d 387] (1976). But the *Industrial Gas* court acknowledged the continuing validity of *Radovich* and *Nichols,* distinguishing them because "the conspiracies in both cases were intended to restrict competitive conditions in the labor market, [and] the injuries complained of, restriction of employment opportunities, were directly related to the anticompetitive effects." [681 F.2d] at 517.

571 F.Supp. at 865–66.

■ The Ninth Circuit recently concurred with this Court's assessment that *Radovich* continues to confer standing on employees challenging antitrust conspiracies aimed directly at them in their employment. *Ostrofe v. H.S. Crocker Co., Inc.,* 740 F.2d 739 (9th Cir.1984), *cert. dismissed,* —— U.S. ——, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985). *See id.* at 743 ("As a victim of an alleged boycott, Ostrofe 'is entitled to an opportunity to prove his charges.' "); *id.* at 748 (Kennedy, J., dissenting) ("We agree that Ostrofe has standing to challenge a conspiracy among label manufacturers to boycott his services."). Likewise, academic commentary confirms this Court's analysis of the situations in which employees possess or lack antitrust standing:

> The very context of employee standing requires explanation, because employees will attempt to maintain section 4 actions in varying capacities. For example, employees may allege derivative injury flowing from a business weakened by an anticompetitive scheme. They may also allege more direct injury resulting from a concerted refusal to deal aimed directly at them and at the employment market of which they are a part. Generally, employees are denied antitrust standing in the former case, and granted it in the latter.

Note, *Employee Standing Under Section 4 of the Clayton Act,* 81 Mich.L.Rev. 1846, 1859 (1983) (footnotes omitted).

Cases involving the direct application of illegal restraints against one or more employees do not involve a complicated

standing analysis. When a party intentionally engages in anticompetitive activity against specific parties, the victims have standing to sue the violator. The requirements of antitrust injury clearly are satisfied, giving the victims standing to bring treble damage actions. If an employee is not the object of the anticompetitive conduct, however, the situation is different. Without an independent illegal restraint of trade to create grounds for standing, the policies underlying antitrust laws come into play, and courts must consider the remoteness and antitrust nature of the injury in deciding whether the employee has standing to sue under the antitrust laws.

\* \* \* \* \* \*

Employees victimized by hiring boycotts, as well as displaced distributors, should have standing to bring treble damage actions.... In contrast, the employees of a violator discharged in furtherance of an anticompetitive scheme are not the intended objects of the anticompetitive activities....

Note, *Antitrust Standing of Terminated Employees*, 25 Wm. & Mary L.Rev. 341, 355–57 (1983). *See also* Note, *Antitrust Injury and Standing: A Question of Legal Cause*, 67 Minn.L.Rev. 1011, 1020–21 & nn. 50–51, 1025–26 (1983).

B.

Counts IV and V of the complaint allege that Plain Dealer, Press Publishing and Cole conspired in restraint of trade and participated in monopolization and attempts to monopolize. Paragraph 20 states that the defendants so acted "for the purpose and with the intent of creating a monopoly in the product market of daily and Sunday newspapers for the Greater Cleveland area, and for the purpose of terminating the Job Security Agreement." Paragraph 21, in essentially identical language, states that their purpose "was to eliminate all major competition to the Plain Dealer's business in the Greater Cleveland area and to terminate the Job Security Agreement." Paragraph 22 describes the sale of the Press' subscription list to Plain Dealer "as part of the conspiracy to restrain Press Publishing and Cole from selling 'The Cleveland Press' to any potential successor of the agreement . . ."

Accepting these allegations as true, this court denied defendants' motions to dismiss under Fed.R.Civ.P. 12(b)(6):

[This Court views] ... the *Radovich-Nichols* line of cases ..., holding that a Sherman Act conspiracy directed at employees provides them with antitrust standing, as controlling. They involve precisely the kind of "inextricably entwined" injury held actionable in *McCready* and *Associated General Contractors*. As we read the complaint, one goal of the conspiracy between the publishers was to terminate the plaintiffs' job security agreement. Unlike *Reibert* and similar cases, where the corporate employer was the target of the monopolization effort and the employee a derivative victim, here the employer, the Press, is alleged to be no victim but rather a party to the conspiracy, and the employees, like Radovich, the targets. We find this a sufficient allegation of antitrust injury.

571 F.Supp. at 866–67.

■ But in reviewing defendants' motions for summary judgment, this Court looks not to plaintiffs' allegations, but rather to whether the evidence, viewed in the light most favorable to the plaintiffs, continues to present a genuine issue of material fact for a jury.[3] The record is replete

---

3. The Sixth Circuit consistently has advised district courts that "cases involving questions of motive or intent are normally not suited to disposition on summary judgment." *Smith v. Hudson*, 600 F.2d at 63. Nonetheless, since the 1982 Advisory Committee Note to Fed.R.Civ.P. 56 reemphasized that summary judgment is "applicable to all actions," the court has affirmed summary judgments in a series of antitrust and intent-related cases, maintaining that "the very purpose of a motion for summary judgment, to eliminate a trial where it would be unnecessary and merely result in delay and expense, warrants summary disposition of such cases when appropriate." *Bouldis v. U.S. Suzuki Motor Corp.*, 711 F.2d at 1324. "Once the defendant

with facts from which a jury could conclude that Plain Dealer, Press Publishing and Cole "conspired together in restraint of trade for the purpose and with the intent of creating a monopoly in the product market of daily and Sunday newspapers for the Greater Cleveland area ..." When read most favorably to the plaintiffs, the transactions giving rise to these actions (as described and summarized in Parts I–C and I–D, *supra*, at 11–17), show that in May and June of 1982, Cole, Maloney, Newhouse and their lawyers negotiated agreements, the result of which was that Plain Dealer: (1) paid Press Publishing $14.5 million for a subscription list whose value was negligible or non-existent; and (2) gave $8 million, a $1 million loan, and a guaranteed services contract to the owners of Del-Com, a newly-formed, debt-ridden entity whose capital at the time of its creation in February of 1982 was $500. Such facts surely create a disputed issue of material fact with respect to defendants' possible intent to encourage, facilitate or ensure the closing of the Press. But the employees only have standing to pursue this claim further if there are some facts which indicate that they were not merely injured by the alleged conspiracy but were its targets. They have failed to come forward with any such evidence.

Initially, the employees contend that they must have been a target of the alleged antitrust conspiracy because "[t]heir Job Security Agreement, with its uniqueness and the burden it imposed on defendants, Press and Plain Dealer, made the plaintiffs an undoubtedly major consideration to the management of either newspaper." Plaintiffs' Brief in Opposition to Motions for Summary Judgment at 30–31. Even if true, such speculation is wholly insufficient

to permit a fact-finder to conclude that the publishers' actions were directed at Press employees.

Second, the employees allege that the alleged conspiracy must have been directed at them because

> ... the express terms of paragraph 2 of the Job Security Agreement state that if *any* employer should cease publication, the Job Security Agreement would no longer be effective. Thus, when the Press ceased publication the Plain Dealer was free to assert that the Job Security Agreement was no longer in effect. The fact that it did not *expressly* do so does not detract in any way from the Plain Dealer's desire to escape the Job Security Agreement's burden....

*Id.* at 32 (emphasis in original). This argument too is unconvincing. Paragraph 2 cannot be read to suggest that the Press' closing terminated Plain Dealer's Job Security Agreement or permitted Plain Dealer to terminate it at any time. If both newspapers closed, both Agreements ended; if one newspaper closed, its Agreement ended but the other's was unaffected. Moreover, plaintiffs' argument is inconsistent with the undisputed evidence that Plain Dealer adhered to its Job Security Agreement after the Press closed and, in fact, negotiated another costly "buy-out" modification to the Agreement. This Court need not agree or disagree with plaintiffs' contention that "it is difficult at best to imagine that the Job Security Agreement was not a primary consideration of defendants in their course of conduct," *id.* at 37, to conclude that mere speculation about the defendants' goals and motives is not probative evidence creating a disputed issue of material fact about the existence of a *Radovich*-type antitrust conspiracy.

---

has adequately rebutted the plaintiff's allegations by establishing legitimate alternative explanations for its conduct which disprove the inferences that plaintiffs seek to draw, then the plaintiffs must come foward with some significant probative evidence tending to support the complaint." *Shavrnoch v. Clark Oil and Refining Corp.*, 726 F.2d 291, 293 (6th Cir.1984) (quoting *Smith v. Northern Michigan Hospitals, Inc.*, 703 F.2d 942, 948 (6th Cir.1983)). *See also*

*Heheman v. E.W. Scripps Co.*, 661 F.2d 1115, 1127–28 (6th Cir.1981), *reh'g denied,* 668 F.2d 878 (6th Cir.), *cert. denied,* 456 U.S. 991, 102 S.Ct. 2272, 73 L.Ed.2d 1286 (1982) ("no issue is immune from summary judgment"; summary judgment granted to defendants on tortious interference with contract claim); W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact,* 99 F.R.D. 465, 473–75 (1983).

The employees' third and final argument is that Kenneth Johnson's affidavit and James Maloney's deposition testimony demonstrate "that the desire to eliminate the Job Security Agreement was a major reason Samuel Newhouse and the Plain Dealer adamantly refused to enter into a joint operating agreement with the Press." *Id.* But Maloney's testimony is only that Newhouse was unpersuaded by his arguments in favor of a joint operating agreement; the Job Security Agreement is nowhere mentioned in the deposition testimony (pages 133–36) cited in plaintiffs' brief. And Johnson's affidavit states only that "[d]uring several business discussions *between myself and Mr. Cole,* it was clear that a major objection to a joint operating agreement as expressed by Mr. Newhouse was the labor contract requirements at the Cleveland Press, including the various personnel manning guarantees and the overtime obligation." His statement is, as Plain Dealer argues, both inadmissible double hearsay and not germane to the question of Newhouse's knowledge and intent. Moreover, Plain Dealer's decision not to participate in a joint operating agreement—a business arrangement sanctioned but not mandated by the Newspaper Preservation Act, 15 U.S.C. § 1801 *et seq.*—is not an antitrust violation and cannot be used to establish that defendants' purpose was to eliminate the employees' jobs.

Accordingly, the undisputed material facts provide no basis for a conclusion that defendants were engaged in a conspiracy intended to restrict competitive conditions in the labor market and directed at the plaintiffs. The *Radovich* line of cases no longer provides the plaintiffs with standing.

C.

Without that basis for standing, the employees lack constitutional and statutory grounds for pursuing an antitrust action. "Antitrust violations admittedly create foreseeable ripples of injury to individual stockholders, consumers and employees, but the law has not allowed any of these standing to sue." *Province,* 571 F.Supp. at 866 (quoting *Reibert v. Atlantic Richfield Co.,* 471 F.2d at 731) . Consistent with this view is the Sixth Circuit's opinion in *Meyer Goldberg, Inc. of Lorain v. Goldberg,* where the court denied antitrust standing to stockholders because "[t]he reduction in the value of the Goldbergs' stock is merely a derivative effect of the injury to the corporations." 717 F.2d at 294.

Also consistent with this view is an important footnote in *Associated General Contractors:*

> Because of the absence of specific allegations, we can only speculate about the specific components of the Union's claim. If the Union asserts that its attempts to organize previously nonunion firms have been frustrated because nonunion firms wish to continue to obtain business from those subjected to coercion by the defendants, its harm stems most directly from the conduct of persons who are not victims of the conspiracy. See n. 14, *supra.* If the Union claims that dues payments were adversely affected because employees had less incentive to join the Union in light of expanding nonunion job opportunities, its damage is more remote than the harm allegedly suffered by unionized subcontractors. The same is true if the Union contends that revenues from dues payments declined because their unionized employers lost business. *That harm, moreover, is even more indirect than the already indirect injury to its members, yet a number of decisions have denied standing to employees with merely derivative injuries. See, e.g., Pitchford v. PEPI, Inc.,* 531 F.2d 92, 97 (CA3 1975), cert. denied, 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976); *Contreras v. Grower Shipper Vegetable Ass'n,* 484 F.2d 1346 (CA9 1973), cert. denied, 415 U.S. 932, 94 S.Ct. 1445, 39 L.Ed.2d 490 (1974); *Reibert v. Atlantic Richfield Co.,* 471 F.2d 727 (CA10), cert. denied, 411 U.S. 938, 93 S.Ct. 1900, 36 L.Ed.2d 399 (1973). *But see Nichols v. Spencer Int'l Press, Inc.,* 371 F.2d 332, 334 (CA7 1967).

459 U.S. at 541 n. 46, 103 S.Ct. at 910 n. 46 (emphasis added). The footnote is appropriately read as an endorsement of decisions denying employees standing unless the antitrust conspiracy is directed at them.[4]

*Ostrofe v. H.S. Crocker Co., Inc.* does not alter this conclusion. The facts there were set forth as follows:

> Frank J. Ostrofe, former marketing director of H.S. Crocker, Inc., filed suit against Crocker for injuries resulting from a violation of the Sherman Act. The complaint alleged that Crocker and other manufacturers of paper lithograph labels conspired to restrain interstate trade and commerce in such labels ... and that the conspiracy was effectuated in part by coercing Ostrofe, as Crocker's sales manager, to rig bids, fix prices, and allocate markets. Ostrofe violated the agreement by competing freely for business. Crocker's co-conspirators complained to Crocker's executive officers, who in turn warned Ostrofe to cooperate. Ostrofe refused. He was forced to resign from his job as Crocker's sales manager and alleged he was boycotted from further employment in the industry.

740 F.2d at 741–42.

The court's initial holding—that Ostrofe possessed "standing with respect to his suit against Crocker based on an implied agreement among label manufacturers to discharge him and interfere with his opportunity for re-employment in the labels injury," *id.* at 742—is undisputedly true and undisputedly inapplicable to this case in its current posture. The panel majority went on to state two reasons for granting Ostrofe "standing to challenge the conspiracy to fix prices and allocate sales in the market for labels." *Id.* at 744.

First, the majority concluded that Ostrofe had suffered "antitrust injury":

> As sales manager of one of the label manufacturers, Ostrofe was an essential participant in the scheme to eliminate competition in the marketing of labels by fixing prices and allocating customers. It could not succeed without his active cooperation. When Ostrofe sold labels to customers not allocated to his employer and at prices below those agreed upon, his discharge was a necessary means to achieve the conspirators' illegal end as well as an integral and inextricable part of the anticompetitive scheme....
>
> Although Ostrofe was not a competitor or consumer in the labels market, the injury he sustained was such an integral part of the scheme to eliminate competition in that market as to constitute "antitrust injury" as that concept is developed in [*McCready* ].

*Id.* at 745–46.

In the alternative, it ruled that he possessed standing even if he had not suffered "antitrust injury" as such:

> ... Assuming Ostrofe himself is held not to have sustained antitrust injury in the strictest sense from the conspiracy to fix prices in the label market, his refusal to cooperate with the conspiracy nonetheless helped vindicate the rights of customers and competitors in that market. Affording standing to sue to such an employee discharged because he refused to cooperate in an antitrust violation by his employer encourages exposure of such schemes by persons best situated to know of their existence. Presumably others were also victimized by the price fixing conspiracy, but it is unlikely that any other victim with knowledge of the conspiracy sustained a kind of injury that would give him equal incentive to bring the antitrust violators to account. Denying standing to one in the position of Ostrofe and others similarly situated is "likely to leave a significant antitrust

---

**4.** Cases decided since *Associated General Contractors* have reaffirmed the continued validity of the precedents cited by the Court. *See, e.g., Central National Bank v. Rainbolt*, 720 F.2d 1183, 1186 (10th Cir.1983) (citing *Reibert* );

*American Key Corp. v. Cumberland Associates*, 579 F.Supp. 1245, 1248 (N.D.Ga.1983) (citing *Pitchford* ); *Commercial Credit Business Loans, Inc. v. Martin*, 590 F.Supp. 328, 331 (E.D.Pa. 1984) (same).

violation undetected or unremedied." ... The injury to such an employee is intentional and is caused in fact by the employer's conspiracy to restrain competitors. The injury is neither remote nor derivative from injury to others but is immediate and direct. . . .

*Id.* at 746–47 (citations omitted).

Central to the *Ostrofe* holding is Ostrofe's allegation that "his discharge was a necessary means to achieve the conspirators' illegal end as well as an integral and inextricable part of the anticompetitive scheme ..." and the court's belief that "[a]ffording standing to sue to such an employee discharged because he refused to cooperate in an antitrust violation by his employer encourages exposure of such schemes by persons best situated to know of their existence." The present cases present different facts and policy considerations. The plaintiffs' job loss was a derivative consequence of the alleged conspiracy among Plain Dealer, Press Publishing and Cole, not "an integral and inextricable part of the anticompetitive scheme." The employees were not discharged for refusing to join in the conspiracy; the complaint does not make, nor does the record substantiate, such a contention. Accordingly, this Court need not decide whether *Ostrofe* or the Seventh Circuit's *Bichan* opinion, denying standing to a plaintiff who made similar allegations, states an appropriate rule for this Court, since even if *Ostrofe* were applied in its entirety, the *Province* plaintiffs would lack standing.

Without reaching the merits of Counts IV and V of the complaint, summary judgment is entered for the defendants and plaintiffs' claims are dismissed for want of standing. The plaintiffs' cross-motion for partial summary judgment on Counts IV and V is denied.

## VI. RIDLEY: TORTIOUS INTERFERENCE WITH CONTRACT

Closely related to all of the *Province* claims is the one-count *Ridley* action, which states that Plain Dealer, through Newhouse, induced Press Publishing to cease publication of the Press and thereby committed tortious interference with the Job Security Agreement.

While Plain Dealer and Newhouse removed *Ridley* to this Court as a case presenting a federal question under section 301, the parties have briefed this claim under Ohio common law tort standards. The court of appeals has accurately observed that "[t]he structure of the tort of interference with contractual relations is incompletely outlined in Ohio case law ..." *Heheman v. E.W. Scripps Co.,* 661 F.2d 1115, 1126 (6th Cir.1981), *reh'g denied,* 668 F.2d 878 (6th Cir.), *cert. denied,* 456 U.S. 991, 102 S.Ct. 2272, 73 L.Ed.2d 1286 (1982). It defined the cause of action in this fashion:

> ... one who, without a privilege to do so, induces or otherwise purposely causes a third party not to enter into, or continue, a business relationship with another is liable to the other for the harm caused thereby.

*Id.* at 1127 (quoting *Juhasz v. Quik Shops, Inc.,* 55 Ohio App.2d 51, 379 N.E.2d 235, 238 (Summit County 1977)). The court indicated that "malice ... on the part of the interferor is not an essential element of the cause of action. *Reichman v. Drake,* 89 Ohio App. 222, 100 N.E.2d 533, 537 (1951)."

Other Sixth Circuit, district court and Ohio cases are consistent with *Heheman. See Battista v. Lebanon Trotting Ass'n,* 538 F.2d 111, 116 (6th Cir.1976); *Adkins v. General Motors Corp.,* 556 F.Supp. 452 (S.D.Ohio 1983); *Ross v. Woyan,* 1 Ohio App.3d 39, 439 N.E.2d 428 (Franklin County 1980) (citing *Restatement (Second) of Torts* § 766). *See also Premix, Inc. v. Zappitelli,* 561 F.Supp. 269, 277 (N.D.Ohio 1983). Therefore, Plain Dealer and Newhouse can prevail on their summary judgment motion only if the facts, read most favorably to the plaintiffs, provide no basis for concluding that Newhouse intentionally "induce[d] or otherwise purposely cause[d]" Press Publishing "not ... to continue ... [to] perform a contract with" the plaintiffs. The facts and arguments relevant to this determination are substantially

similar to those involved in deciding whether plaintiffs possess antitrust standing under *Radovich* as targets of an anticompetitive conspiracy.

Plain Dealer and Newhouse argue that summary judgment is appropriate because the undisputed facts establish that Newhouse did not know of the existence of the Job Security Agreement, did not act with malice towards the plaintiffs, and committed no acts which were the proximate cause of any breach of the Job Security Agreement. Plaintiffs do not present specific evidence, pursuant to Fed.R.Civ.P. 56(e), challenging Newhouse's deposition testimony that he was unaware of the Job Security Agreement; instead, they argue that Plain Dealer, which had a Job Security Agreement with its own employees, must have been aware of the Press' Agreement with its employees. They suggest in addition that Newhouse's intent to breach the Job Security Agreement can be inferred from the benefits Plain Dealer would allegedly obtain from such a breach, and argue as well that causation can be established because the Press would not have closed but for the acts of Newhouse and Plain Dealer.

Setting aside the first and third issues—Newhouse's knowledge about the Job Security Agreement and the "cause" of plaintiffs' job loss—this Court focuses on the question of defendants' intent. The employees contend that intent to interfere with the Job Security Agreement can be inferred from two groups of facts. First, they suggest, intent can be inferred from the "benefits to Newhouse from the elimination of plaintiffs' contracts at the Press, and the Plain Dealer's expeditious capitalization of the opportunities provided by the termination of the contracts ..." Brief at 56. Close reading of their brief reveals only one such purported "benefit": the fact that, within a few months after the Press closed, Plain Dealer negotiated a modification to its own Job Security Agreement. No evidence of a causal relationship between the Press' demise and this expensive "benefit" is available, nor is it explained how this transaction possibly demonstrates the defendants' specific intent to interfere

with the Press' Agreement. Second, plaintiffs again submit that Plain Dealer and Newhouse intended to interfere with the Press' Job Security Agreement because "the express terms of Paragraph 2 of the Job Security Agreement ... provided that the entire agreement would terminate upon cessation of publication of either paper. Thus the Plain Dealer could free itself of its own Job Security Agreement by inducing the Press to breach its contract." *Id.* As discussed in Part V–B, *supra,* this reading of the contract is simply erroneous.

■ This Court again concludes that while a jury could find as a matter of fact that Plain Dealer and Newhouse wanted to assure that the Press went out of business and that Plain Dealer acquired a newspaper monopoly in Cleveland, it could not on the present record properly find that the two defendants specifically intended to interfere with the plaintiffs' Job Security Agreement. There is no evidence that Plain Dealer and Newhouse induced Press Publishing to breach the Agreement. The fact that Plain Dealer and Newhouse might benefit from the closing of the Press—one effect of which was to terminate the employees' Job Security Agreement—would be relevant to antitrust claims, if plaintiffs had standing to pursue them, but provides no basis for presenting a claim of tortious interference with contract to a jury. *Heheman, Battista, Premix,* and the Ohio cases establish tortious interference as a distinct tort with distinct requirements, not a derivative action to be appended to every non-justiciable antitrust claim brought by laid-off employees. One of those clear requirements—offering evidence of defendants' intent to interfere with the contract—cannot be satisfied in this case. Summary judgment must therefore be entered in favor of Plain Dealer and Newhouse. The *Ridley* complaint is dismissed.

## VII. PROVINCE: PENDENT STATE CLAIMS

■ In light of this Court's dismissal of plaintiffs' federal claims in Counts

I–V of the *Province* complaint, and its dismissal of the *Ridley* complaint, it is necessary to address the status of the pendent state claims against Press Publishing, Cole and Lakeside Associates, contained in Count VI of the *Province* complaint. Federal courts have the power to exercise pendent jurisdiction where the state and federal claims derive from a common nucleus of operative facts such that the plaintiff would ordinarily be expected to try them all in one judicial proceeding, and when the federal claim has sufficient substance to confer subject matter jurisdiction. *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). But "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *Id.* at 726, 86 S.Ct. at 1139; 3A J. Lucas, *Moore's Federal Practice* ¶ 18.07[1.–3] at 18–59 (2d ed. 1982 & Supp.1984–85).

Accordingly, this Court, in its discretion, orders the pendent state claims dismissed, without prejudice, for lack of a subsisting federal claim.

## VIII. CONCLUSION

The eighty-nine men who lost their jobs when the Cleveland Press closed invoke fundamental principles of federal labor and antitrust law: that unionized workers are entitled to the benefits promised them in collective bargaining agreements, and that competitors must not destroy free markets and consumer choice through illegal combinations in restraint of trade. But the employees' desire to challenge transactions which allegedly cost them their livelihoods must be balanced against other, equally fundamental judicial doctrines. The statutes that protect viable trade unionism rest on the principle that collective bargaining agreements must in the first instance be enforced by the unions who negotiated them; only when a union betrays its members' interests may individual employees sue to enforce the agreement. Similarly, complex antitrust litigation can be conducted with some measure of order and coherence only when standing to pursue private actions is limited to those parties most directly injured by anticompetitive transactions. Inevitably, a consequence of these necessary limitations is that not every wrong relating to an antitrust violation can be undone by a private action under the Clayton Act. For this reason, the antitrust statutes provide that in appropriate cases the Department of Justice will vindicate the public interest by commencing a civil or criminal antitrust action.

The defendants' motions for summary judgment are granted. Counts I, II, III, IV and V of the *Province* complaint, and the entire *Ridley* complaint, are dismissed, with prejudice. Count VI of the *Province* complaint is dismissed, without prejudice.

IT IS SO ORDERED.